In re A.H. ROBINS COMPANY,
INCORPORATED, Debtor.

In re Tessie ROGERS, D.S. # 81685, Ann
Colby Dill and William H. Barnes, D.S.
# 84346, Linda Hammacher, D.S.
# 32040, June E. Welsh and Gerald
Welsh L.D.S. # 7151 and # 7152, Carol
Ann Eastland, D.S. #, Laurie Soloman,
D.S. # 77757, Ralph G. Reiser (Galeotaf-
iores).

Bankruptcy No. 85–01307–R.

United States District Court,
E.D. Virginia,
Richmond Division.

July 25, 1991.

Ralph G. Reiser, Syosset, N.Y., for Kath-
leen and Anthony Galeotafiore.

Donald Kronenberg, Kronenberg & As-
sociates, Seattle, Wash., Theodore I. Bren-
ner, Richmond, Va., for Carol Ann East-
land.

Gertrude C. Bartel, Dramon & Graham,
P.A., Baltimore, Md., for June E. and Ger-
ald Welsh.

Kathleen Howard Meredith, Semmes,
Bowen & Semmes, Baltimore, Md., for
Charles Hughes, M.D., et al.

Stephen J. Hughes, Miles & Stockbridge,
Baltimore, Md., for Sylvan Frieman, M.D.,
Richard Berkowitz.

W. Scott Street, III, Williams Mullen
Christian & Dobbins, Richmond, Va., for
Aetna.

Guerry R. Thornton, Jr., Thornton &
Leff, Atlanta, Ga., for Tessie Rogers.

Daniel Clements, Suzanne Farace, Israel-
son, Salsbury, Clements & Beckman, Balti-
more, Md., for Ann Colby Dill, William
Barnes.

T. Michael Preston, Anderson, Coe &
King, Baltimore, Md., for Johns Hopkins
Hospital.

Orran L. Brown, Christian Barton Epps
Brent & Chappell, Richmond, Va., for Dal-
kon Shield Claimants Trust.

John C. Lynch, MacLeay, Lynch, Gregg
& Lynch, P.C., Washington, D.C., for Pre-
term Center for Reproductive Health.

Michael A. Pretl, Pretl & Erwin, P.A.,
Baltimore, Md., for Ann Colby Dill, William
Barnes, Linda Hammacher.

James A. Hines, Jr., Rosen, Wachtell &
Gilbert, Los Angeles, Cal., for Class coun-
sel Galloway Class Action Suit.

Kevin Brady, Willkie Farr & Gallagher,
New York, N.Y., for American Home Prod-
ucts.

David V. Johnson, Sullivan, Hall, Booth
& Smith, Atlanta, Ga., for Joseph S. Leyva,
M.D., Otis Carl Mitchell, M.D.

David M. Feitel, Miles & Stockbridge,
Baltimore, Md., for Clifford R. Wheeless,
Jr., M.D.

## MEMORANDUM

MERHIGE, District Judge.

Each of the captioned proceedings requires an interpretation of Article I, Section 1.85 of the Debtors Sixth Amended and Restated Plan of Reorganization ("Plan"), pursuant to Article VIII, Section 8.05(c). Section 1.85 defines "Unreleased Claims" under the Plan and thereby sets the parameters delimiting those suits that both involve the Dalkon Shield ("Shield") and that fall beyond the scope of the Plan's broad injunction.

With the exception of the matter styled *Dalkon Shield Claimants Trust v. Ralph G. Reiser,* the initiating parties—either Dalkon Shield claimants, former Dalkon Shield claimants, and one who may be a late claimant—have brought these matters before the Court by virtue of Motions to Interpret the Plan. The *Reiser* matter is before the Court on a Complaint by the Dalkon Shield Claimants Trust ("Trust") seeking a permanent injunction enjoining Ralph G. Reiser, counsel for claimants Kathleen and Anthony Galeotafiore, from the continuation of a civil action pending in the Supreme Court of the State of New York, in the County of Nassau. The Galeotafiores filed this action against medical doctors alleging malpractice associated with the Shield.

The Trust has moved for judgment on the pleadings as to the motions of June and Gerald Welsh and has responded to each of the motions to interpret. Certain of the health care providers have intervened in an effort to convince the Court that the Plan bars the claims asserted against them.

## DISCUSSION

Each of the movants whose motions to interpret the Plan are now pending before the Court, as well as the Galeotafiores, has filed an action against certain health care providers. Each contends that his or her suit is "based exclusively on medical malpractice" under Section 1.85 of the Plan and is thereby not barred by the release and injunctive provisions of Sections 8.03 and 8.04 of the Plan.

After a careful analysis of the Plan, the Court is satisfied that none of the movants seeking an interpretation of Section 1.85 of the Plan, nor Mr. Reiser's clients, have "Unreleased Claims" as referred to in Article I, Section 1.85 of the Plan. Additionally, some, though not all, parties appear to have violated the injunctive provisions of Section 8.04.

## I. *The Plan*

Not unlike statutory interpretations, an interpretation of the meaning and intent of the Plan—including the Claimants Trust Agreement, Other Claimants Trust Agreement and/or the Claims Resolution Facility—must begin with the precise language utilized in the Plan. The Plan specifically defines the operative terms in these motions, terms whose context in the Plan the Court also must consider. Additionally, the Court must consider the intent and purpose of the scheme of reorganization, as found in the history of the bankruptcy proceedings and in the massive litigation engaged in since the inception of the Debtor's utilization of Chapter 11 of the Bankruptcy Code. In this regard, the Court at all times remains aware that the principal—if not sole—objective of the Plan that emerged from those proceedings, in reference to individuals with valid Shield claims, is to pay, within its limited resources, full value for injuries related to the use of the Shield.

The history of this case reflects an intent on the part of the Debtor, the appropriate committees and American Home Products (whose financial involvement in the reorganization made it possible, in a major part, to fund the Trust in an amount estimated at the time to be sufficient) to compensate all valid Shield claimants fully and fairly and to channel all Shield claims to the Trust, thereby effectuating what was referred to in the context of claims involving use of the Shield as "global peace." Indeed, that goal was an absolute requirement of American Home Products, which was then contemplating becoming, as it did, the Debtor's successor by way of a merger, but which was not willing to participate unless it was to be free of the burdens attending continued litigation.

With this background in mind, four aspects of the Plan are of particular relevance to the arguments now before the Court. These are the definition of a "Dal-

kon Shield Claim," the scope of the release of alternative liability for Dalkon Shield Claims and the Plan's resultant injunction, as well as the parameter of Unreleased Claims which may be pursued regardless of that injunction.

A "Dalkon Shield Claim" is defined in Article I, Section 1.37 as follows:

"... all Claims, demands, suits, causes of action, proceedings or any other rights or asserted rights to payment heretofore, now or hereafter asserted against the Debtor, the Successor Corporation, any of the Affiliates of the Debtor or the Successor Corporation, or either of the Trusts, whether or not reduced to judgment, based upon or in any manner arising from or related to (w) the Dalkon Shield, (x) the research and development, manufacture, distribution, sale, provision, recommendation, insertion, use or removal of a Dalkon Shield, (y) the processing, adjustment, defense, settlement, payment, negotiation or handling of any claims, demands, suits, proceedings or causes of action based upon or relating in any way to the Dalkon Shield, or (z) the failure to warn, disclose or provide information concerning, or to take remedial action with respect to, the Dalkon Shield, including, without limitation, (a) those for death or personal injuries, including emotional distress, (b) those of any Person against whom any claim, demand, proceeding, suit or cause of action based upon *or in any manner arising from or relating to any of the matters enumerated or described in (w), (x), (y) and/or (z) above* has been, is or may be asserted (including, without limitation, rights of indemnity, whether contractual or otherwise), contribution, subrogation and reimbursement, (c) those for damages, including punitive damages, (d) those for attorneys' fees and other expenses, fees or costs, (e) those for any possible economic loss or loss of consortium, (f) those for damage to reputation, and ....." (Emphasis added).

In short, the definition of Dalkon Shield Claim makes clear that any claim asserted or right to payment based upon or in any manner arising from or related to the Shield is intended to be a Dalkon Shield Claim. In addition, the Trust contends that it has consistently interpreted the definition broadly to, as counsel for the Trust states, "encompass any claim for damages for injuries received in a sequence of events or set of facts in which the Dalkon Shield was involved in any fashion."

Under the Plan, holders of Dalkon Shield Claims generally "release" all claims "based upon or in any manner arising from or related to the Dalkon Shield." In Section 8.03, the Plan specifically confirms the scope of this Release.

8.03 **Release.** Except as otherwise expressly provided in the Plan, on the Confirmation Date, (a) all persons (i) who have held, hold or may hold Claims, including, without limitation, Dalkon Shield Claims or Dalkon Shield Liquidated Claims or (ii) who have held, hold or may hold Robins Common Stock, and (b) the Debtor, the Successor Corporation and their Affiliates, in consideration for the promises and obligations of the Debtor and the Successor Corporation under the Plan, including the establishment and funding of the Trusts, will be deemed to have forever waived, released and discharged all rights or claims, whether based upon tort, fraud, contract or otherwise, which they heretofore, now or hereafter possess or may possess against any Person (excluding only Unreleased Claims) based upon or in any manner arising from or related to (w) the Dalkon Shield, (x) the research and development, manufacture, distribution, sale, provisions, recommendation, insertion, use or removal of a Dalkon Shield. (y) processing, adjustment, settlement, payment, defense, negotiation or handling of any claims, demands, suits, causes of action or proceedings, based upon or relating in any way to the Dalkon Shield, or (z) the failure to warn, disclose or provide information concerning, or to take remedial action with respect to the Dalkon Shield, including, without limitation, (a) those for indemnity, whether contractual or otherwise, contribution, publication and reimbursement with respect to any claim, demand, proceeding, suit or cause of action that has been, is, or may be asserted against any Person based upon or in any manner arising from or relating to any of

the matters enumerated or described in (w), (x), (y) and/or (z) above, (b) those for death or personal injuries, including emotional distress, (c) those for damages, including punitive damages, (d) those for attorneys' fees and other expenses, fees or costs, (e) those for any possible economic loss of consortium, (f) those for damages to reputation, and (g) those for any equitable remedy, all such rights and claims being hereinafter referred as "Dalkon Shield—Related Claims."

The Release provision thus generally waives recovery for individuals for injuries that amount to Dalkon Shield Claims. As discussed below, of course, holders of Dalkon Shield Claims may participate in the Trust's claims process to recover for their injuries.

The Plan's Injunction provision essentially works in tandem with the Release provision. The Injunction generally prohibits the filing of suits based on Dalkon Shield Claims, suits that are subject to the Plan's release. The Injunction, which was provided for in the Court's Confirmation Order, reads as follows:

> 8.04 **Injunction.** Except as otherwise expressly provided in the Plan, the Confirmation Order will provide that (a) all Persons (i) who have held, hold or may hold Claims, including without limitation, Dalkon Shield Claims or Dalkon Shield Liquidated Claims, or (ii) who have held, hold or may hold Robins Common Stock, and (b) the Debtor, the Successor Corporation and any of their Affiliates, are permanently enjoined on and after the Confirmation Date (a) from commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim or any Dalkon Shield—Related Claim against the Debtor, its shareholders, the Successor Corporation, any of the Affiliates thereof (including, without limitation, AHP), the Trusts or any other Person or the property of the Debtor, the Successor Corporation, any of the Affiliates thereof, or of any other Person, (b) from the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree, or order against the Debtor, its shareholders, the Successor Corporation, any of the Affiliates thereof (including, without limitation, AHP), or any other Person or the property of the Debtor, the Successor Corporation, any of the Affiliates thereof (including, without limitation, AHP), or any other Person with *respect to any such Claim or any Dalkon Shield–Related Claim,* (c) from creating, perfecting or enforcing any encumbrance of any kind against the Debtor, its shareholders, the Successor Corporation, any of the Affiliates thereof (including, without limitation, AHP), or any other Person or against the property of the Debtor, its shareholders, the Successor Corporation, any of the Affiliates thereof, or any other Person with respect to any such Claim *or any Dalkon Shield–Related Claim,* (d) from asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due the Debtor, its shareholders, the Successor Corporation, any of the Affiliates thereof (including, without limitation, AHP), or any other Person or against the property of the Debtor, its shareholders, the Successor Corporation, any of the Affiliates thereof (including, without limitation, AHP), or any other Person with respect to any such Claim or any Dalkon Shield–Related Claim, and (e) from any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan, the Claims Resolution Facility and the Trust Agreements; provided, however, that such injunction shall not impair the rights of Persons with Dalkon Shield Claims or Dalkon Shield Liquidated Claims from asserting Unreleased Claims. After properly electing trial by jury under Option 3 of the Dalkon Shield Trust Claims Resolution Facility, a Person shall, notwithstanding this section, be entitled to continue or commence a jury trial against the Claimants Trust for the purpose only of obtaining a judgment for compensatory damages against the Trust liquidating that person's Dalkon Shield Claim so that it may be paid with other Allowed Dalkon Shield Personal Injury Claims in the ordinary course of the Trust's operations consistent with the provisions of the Claims Resolution Facil-

ity and such other procedures as the Trustees may establish pursuant to the Claims Resolution Facility. The holder of any such judgment shall be enjoined from executing against either of the Trusts or their assets.

See In re A.H. Robins, 880 F.2d 694, 700–02 (4th Cir.1989) (upholding Plan's Injunction provision).

Each of the individuals in this cause contends that his or her claims asserted against the several health care providers in alternative judicial forums fall outside of the scope of the Plan's Injunction and Release. They assert that under the Plan the claims filed represent "Unreleased Claims" as defined in Section 1.85 of the Plan. Section 1.85 of Article I reads as follows:

> **Unreleased Claims.** "Unreleased Claims" means any claims, demands, suits, causes of action or proceedings heretofore, now or hereafter asserted by (a) any holder of a Dalkon Shield Claim or a Dalkon Shield Liquidated Claim (i) against the Claimants Trust but only in accordance with the terms of the Plan, the Claimants Trust Agreement and the Claims Resolution Facility, (ii) against the Other Claimants Trust but only in accordance with the provisions of the Plan and the Other Claimants Trust Agreement, or (iii) against any insurer (including, subject to Section 6.06 of the Plan, Aetna) or based exclusively on medical malpractice, if but only if such claims, demands, suits, causes of action or proceedings brought against or relating to such insurers or medical malpractice under this clause (iii) cannot be asserted or brought over, either in whole or in part, against one or both of the Trusts, Robins, the Successor Corporation, any Affiliates thereof, or any other Person intended to be protected either by the release described in Section 8.03 of the Plan or the injunction described in Section 8.04 of the Plan, and (b) Robins, the Successor Corporation, any Affiliate thereof, either of the Trusts, or any other Person against Aetna relating to any

insurance policies that may be issued by Aetna in connection with the Plan or settlement of the Breland Case.

Thus the Plan allows certain claims—these Unreleased Claims—to go forward even in the face of the Release and Injunction. The first two types of actions allowed—those against the Trust and the Other Trust in accordance with the Plan—amount to the central claims process for Dalkon Shield Claims. The question before the Court requires an interpretation of Section 1.85 in order to determine whether the claims asserted fall within the third type of Unreleased Claim, a task completed only by construing the definitions cited above.

The third type of Unreleased Claim allows suits or actions by the holder of a Dalkon Shield claim "against any insurer ... or based exclusively on medical malpractice...." Defining the scope of these Unreleased Claims, however, demands a keen understanding of the nuances of the Plan. First, it is axiomatic that such Unreleased Claims—asserted by holders of Dalkon Shield Claims—are a small sub-group of all of the Dalkon Shield Claims, in short, they must in some manner—if only a tangential one—be based upon, arising from or related to the Shield. See Section 1.85(a).[1] However, although in some manner related to a Shield, Unreleased Claims for medical malpractice may be only those claims based *exclusively* on medical malpractice and therefore claims that "cannot be asserted or brought over, either in whole or in part, against one or both of the Trusts." Section 1.85(a)(iii). In other words, the actionable elements of these claims and the injuries allegedly sustained—although in some way related to the Shield—must be fully, separate and apart from the circumstances involving the Shield.

The Court is hesitant to offer an example of such an injury, as it does not intend to reach legal conclusions regarding issues not before it. However, an illustration may aid the construction of "Unreleased Claim." For example, suppose a woman who used the Shield free of problems attended a physician for a check-up and its

---

1. Although the Plan also allows A.H. Robins, the Successor Corporation or the Trust to assert certain Unreleased Claims, see Section 1.85(b), these are not at issue in the motions considered herein.

removal. While examining the woman prior to the removal, the doctor negligently injured the woman with his careless use of a medical instrument in a procedure unrelated to the Shield and in which the Shield played no part in the resulting injury. In the Court's view, this situation presents an Unreleased Claim as the doctor's negligence and the injury sustained by the patient is *wholly* separate from the doctoring surrounding the use and the actual use of the Shield. The claim is, by definition (supra pp. 293–94), a Dalkon Shield Claim—the woman was attending the physician only for removal of the Shield—but the negligence and injury is *wholly* apart from the Shield (which played no part in the injury), its defects and related medical procedures. As such, though the woman has, by definition, a Dalkon Shield claim, it is one generally which would not be compensable from the Trust, though separately actionable.

Although the Trust contends that it would and does offer recovery for any medical injury even tangentially related to the Shield, under the Plan it need not offer a recovery for injuries wholly apart from Dalkon Shield related injuries. Exhibit A of the CRF, which is an integral part of the Plan confirmed by the Court constitutes a presumption that the injuries listed in the exhibit are eligible for payment by the Trust. *See* Guidelines CRF 4, G–2 of the Plan. The Guideline logically is deemed to be considered and utilized as spelling out to the benefit of claimants the fact that if any injury is listed on Exhibit A then it is deemed to have been one caused by the Shield. It follows that same cannot be an Unreleased Claim.

The Court recognizes that the drafters of the Plan intended to provide a mechanism for individuals to recover for negligent injuries that the Trusts were not required to cover. Hence, the Plan included the third type of Unreleased Claims. Nonetheless, this provision included the limitation that such a claim may not be one that is asserted against the Trust through the claims process. With this provision, the drafters plainly intended that claimants not be able to duplicate recovery against the Trust and then against individual physicians or insurers. Consequently, it is presumptive evidence that a Dalkon Shield claim is not an Unreleased Claim if the claimed injury or injuries are on the Exhibit A list or if the Trust determines that any such injury, though not on Exhibit A, is eligible for compensation if timely filed. In addition, the drafters necessarily and fairly aimed to insulate the Trust from liability for indemnification of judgments won against the myriad health care providers associated with the Shield.

Nor may a claimant avoid the strictures of the Plan by failing to file a claim with the Trust, for unfiled Dalkon Shield claims are subject to the Court's injunction.

Counsel for the Trust has represented that the Trust has adopted the following interpretation of an Unreleased Claim.

> An "Unreleased Claim" based on medical malpractice referred to in § 1.85(a)(iii) of the plan is a claim by a holder of a Dalkon Shield Claim or a Dalkon Shield Liquidated Claim for damages for injuries caused solely by actions or omissions by Persons (other than Robins, the Successor Corporation, the Trust, the Other Claimants Trust, or their Affiliates) that allegedly amounted to medical malpractice, where the Dalkon Shield may have been involved or otherwise present in the sequence of events, but did not cause injury.

Based upon the foregoing analysis, the Court is of the view that while the Trust's interpretation may be accurate in the context of the Trustees' consideration of Unreleased Claims as explained by its counsel, a more elaborate definition is required in the interpretation of such claims. The Court therefore finds that Unreleased Claims as intended by the Plan must be more detailed and interprets Unreleased Claims as follows:

> "An "Unreleased Claim" based on medical malpractice referred to in § 1.85(a)(iii) of the Plan is a claim by a holder of a Dalkon Shield Claim or a Dalkon Shield Liquidated Claim for damages for injuries caused solely by actions or omissions by Persons (other than Robins, the Suc-

cessor Corporation, the Trust, the Other Claimants Trust, or their Affiliates) that allegedly amounted to medical malpractice, where the Dalkon Shield may have been involved or otherwise present in the sequence of events, but played no part in any alleged resulting injury, nor was in any manner a claim based upon or arising from or related to the Dalkon Shield, the research and development, manufacture, distribution, sale, provision, recommendation, insertion, use or removal of a Dalkon Shield, the processing, adjustment, defense, settlement, payment, negotiation or handling of any claims, demands, suits, proceedings or causes of action based upon or relating in any way to the Dalkon Shield, or the failure to warn, disclose or provide information concerning, or to take remedial action with respect to, the Dalkon Shield, including, without limitation, (a) those for death or personal injuries, including emotional distress, (b) those of any Person against whom any claim, demand, proceeding, suit or cause of action based upon or in any manner arising from or relating to any of the matters enumerated or described above has been, is or may be asserted (including, without limitation, rights of indemnity, whether contractual or otherwise), contribution, subrogation and reimbursement, (c) those for damages, including punitive damages, (d) those for attorneys' fees and other expenses, fees or costs, (e) those for any possible economic loss or loss of consortium, (f) those for damage to reputation, and ...". *See* Article I, Section 1.37 of the Plan (pp. 293–94 infra).

This definition, which is less broad than that offered by the Trust,[2] nonetheless limits Unreleased Claims to only those where the negligence is wholly apart from the use—and the doctoring involved with the use—of the Shield. The definition also aims to limit Unreleased Claims to those for which the Trusts will not and do not offer compensation.

Based upon this definition and the accompanying analysis, the Court concludes that

each of the medical malpractice suits asserted by the parties reflects a claimed injury involving and/or related to the Shield in a manner that fails to constitute an Unreleased Claim. *See* 8.04 supra, as well as the release provisions of Section 8.03. None of these actions can be said to have been caused solely by actions or failures of the health providers, exclusive of the Shield and the injuries that it has rendered.

The instant movants, one of whom has already received a sum in excess of $70,000 as compensation for her Shield claim would have the Trust either apportion claims so that one would be payable by the Trust and another be deemed Unreleased and giving rise to a claim against a third party, in these cases their physicians. Such, however, would effectively preclude the Trust from fulfilling its obligation to fully and fairly compensate a claimant for the injury suffered.

The "global peace," which was and is an integral part of the Plan, would fail. One may very easily assume that the propensity on the part of many to litigate would result in yet further Shield litigation brought by the health providers seeking in one form or another indemnification or contribution. Suits may be envisioned involving the Trust not only as parties, depending on the boundless imagination of competent or indeed even less than competent counsel, but discovery proceeding as well. Such risk is not to be sanctioned. Even now, because of hundreds and indeed thousands of worthless or diminimus claims including some which appear to be false and which have, in the exercise of reasonable care to protect valid claims, required enormous expenditures on the part of the Trust leading to a decision of the Trustees, as permitted by the Plan, to adopt a hold back policy.

While the Court does not desire to inhibit any party from asserting his or her rights and while each of the instant motions cannot be deemed to be inappropriate, all coun-

---

**2.** The Trust's definition would render as not Unreleased any claim where "the Shield may have been involved ... in the sequence of events." The Trust would thereby definitionally

eliminate the existence of any Unreleased Claims, as no claim would be both a Dalkon Shield Claim *and* not have the Shield involved in the course of events leading to injury.

sel are reminded that excessive litigation has already created delays and costs which have, in the Court's view, been a detriment to the claimants.

## II. *The Cases Pending Before the Court*

A brief examination of the facts surrounding the instant motions will demonstrate that none have an Unreleased Claim.

### A. Tessie Rogers

Ms. Rogers filed a claim with the Trust signed by her agent under penalty of perjury that her injuries arose from her use of the Shield. She specifically contended that the "design defects caused the I.U.D. to migrate out of and perforate claimant's uterus, lodge in abdominal cavity." She alleged as well that despite the presence of the Shield she became pregnant. Indeed, prior to the bankruptcy, she had brought suit against the Debtor and her physicians. Upon acceptance of $74,111.13 from the Trust for her injuries sustained by her use of the Shield, she executed a general release of her Shield claim which did not release Unreleased Claims.[3]

In her pending suit in Clayton County, Georgia, Ms. Rogers alleges that physicians failed to remove the Shield after a pregnancy and instead informed her it had been expelled, causing her injury. She alleges as well that the doctors failed to warn her of the dangers of using the Shield. These allegations plainly duplicate the injuries for which the Trust has compensated Ms. Rogers. In addition, the injuries are typical injuries for which the Trust generally pays compensation. Consequently, the Court does not doubt that these allegations fail to present an Unreleased Claim. Ms. Rogers's pending suit appears to have been filed without regard either to the release she executed, or this Court's injunction.

### B. Ann Colby Dill and William H. Barnes

Ms. Dill and her husband William H. Barnes filed suit, prior to bankruptcy pro-

ceedings, in the Circuit Court for Baltimore City, Maryland, naming as defendants A.H. Robins, Johns Hopkins Hospital, Dr. Wheless and Dr. Davis. They allege in that suit that Dr. Wheless inserted a Shield in Ms. Dill without permission after removing a Shield that had caused her injury. She later developed pelvic inflammatory disease. In that suit, she alleges among other allegations that A.H. Robins distributed a defective and dangerous device and that as a result of "the defect and unreasonably dangerous condition of the product, namely the Shield ... the plaintiff was seriously injured."

In her Proof of Claim filed with the Trust, Ms. Dill, through her agent, contended under penalty of perjury that her injury arose from her use of the Shield and, as a consequence, that she suffered "seriously impaired fertility-bilateral tubal lysis and fibreoplasty—eventually complete infertility." Both Dr. Wheless and Johns Hopkins Hospital have filed claims with the Other Claimants Trust arising out of the *Dill* suit pending in the Maryland court. Both Ms. Dill and her husband have timely filed claims and as late as April, 1991, elected to proceed under Option 3.

Ms. Dill and Mr. Barnes's action against the physicians too generally replicates the allegations and injuries asserted against the Trust in her claim. Each of the injuries alleged in the private action is one closely related to use of the Shield and therefore one compensable by the Trust. The filed action therefore is not an Unreleased Claim.

### C. Linda Hammacher and Wayne Hammacher

The Hammachers, husband and wife, filed suit subsequent to the confirmation of the Plan, in apparent violation of the injunction prohibiting such action. They filed suit against Sylvan Frieman, M.D., et al. in the Circuit Court for the City of Baltimore County, Maryland. The parties to that suit have agreed to stay the suit pending resolution of the instant motion. In the suit, Ms. Hammacher alleges that in

---

**3.** See Appendix "A."

1971 Dr. Berkowitz, a defendant, inserted a Shield into Ms. Hammacher's uterus. She alleges that she then suffered various urinary tract symptoms related to Shield use and thereafter Dr. Frieman performed an abdominal tubal ligation on Ms. Hammacher but, so she alleges, failed to remove the Shield or advise her that the Shield had been left in place. She suffered pelvic inflammatory disease and the Dalkon Shield was removed in 1975.

In her Proof of Claim signed under penalty of perjury and filed with the Trust, Ms. Hammacher contends that her Shield-related injuries were "pelvic infection resulting in hospitalizations, surgeries, emotional and mental anguish and financial loss." In a narrative summary outlining her alleged injuries, her attorney has stated: "All of the problems relate back to her initial difficulties attributable to her use of the Shield both before and following her tubal ligation in 1973. According to the Guidelines adopted by the Trust, she brings this claim for all those injuries." Mr. Hammacher has filed no claim with the Trust. Ms. Hammacher has on May 13, 1991 elected to proceed with her claim against the Trust under Option 3.

As is obvious from a quick comparison, the injuries and negligence alleged in Ms. Hammacher's state law suit virtually replicate those for which she has claimed compensation from the Trust. Hence, it is also apparent to the Court that the claims presented do not amount to an Unreleased Claim.

### D. June E. and Gerald Welsh

The Welshes have commenced suits in the District Court for the District of Columbia as well as in the Circuit Court for Montgomery County in Maryland against medical providers for alleged medical malpractice. Ms. Welsh, who is a late claimant, contended in her claim against the Trust that in September of 1986 she "began experiencing extremely painful intercourse and sharp pains in my left side." She contended that her injury resulted from the Shield having become imbedded in her uterus. Though claimants have filed a late claim by virtue of a stipulation with the Trust, the processing of same will be withheld until the Court's ruling on the instant motion. The Welshes appear to have violated the Court's injunction as their state law claim is based on the same allegations presented to the Trust as a Dalkon Shield Claim.

### E. Laurie Solomon

Ms. Solomon has brought suit against five physicians, a hospital and a professional corporation made up of four of the physician defendants. The action was brought prior to Robins' bankruptcy. The suit, which is pending in the Circuit Court of Cook County, Illinois, alleges amongst other matters that the defendant hospital through its agent, as well as the defendants, negligently failed to remove the Shield from Ms. Solomon. The Complaint states that the Defendants "failed to warn the Plaintiff, Laurie Solomon, that the presence of the Dalkon Shield in her body was likely to result in intra-uterine infection." Complaint Para 5(g). She further contends that "as a proximate result of one or more of the aforesaid negligent acts or omissions by defendant ..." the Plaintiff, Laurie Solomon, suffered injuries.

In a second action commenced by Ms. Solomon in the Circuit Court of Cook County, Illinois in which the sole named defendant was A.H. Robins, Ms. Solomon filed an Amended Complaint on November 9, 1984 alleging in pertinent part, as follows:

3. Subsequent to the insertion of said Dalkon Shield, and while it was being used by the plaintiff, LAURIE SOLOMON, for its intended purpose, specifically on October 10, 1977, plaintiff developed a pelvic inflammatory disease as a result of the presence of said Dalkon Shield, and subsequently was required to have a total hysterectomy and was thereby rendered unable to have children.

4. At the time the Dalkon Shield was inserted into the plaintiff, LAURIE SOLOMON, and at the time it left the control of defendant, A.H. ROBINS, said Dalkon Shield was unreasonably dangerous in one or more of the following respects:

(a) Was designed, manufactured, and sold in a condition that was not reasonably safe and that the Dalkon Shield was likely to cause pelvic inflammatory disease when used for the purpose which was reasonably foreseeable;

(b) Was manufactured and sold to the Family Planning Clinic and to the plaintiff, LAURIE SOLOMON, without adequate warnings that it was likely to cause pelvic inflammatory disease;

(c) Was manufactured and sold to the Family Planning Clinic and to plaintiff, LAURIE SOLOMON, in a defective condition so as to allow the formation of bacteria inside the uterus of plaintiff, LAURIE SOLOMON, which led to the development of pelvic inflammatory disease;

(d) Was manufactured and sold to the Family Planning Clinic and to the plaintiff, LAURIE SOLOMON, without conducting adequate tests to determine the possible adverse reactions and side effects, such as pelvic inflammatory disease, which were likely to develop from the use of the Dalkon Shield.

5. As a proximate result of one or more of the aforesaid, the plaintiff, LAURIE SOLOMON, suffered injuries of a personal and pecuniary nature.

In this suit, Ms. Solomon demands judgment against A.H. Robins in the amount of $15,000.00.

Each of the injuries alleged in Ms. Solomon's Complaints are closely related to the Shield and none exclusively allege medical malpractice within the meaning of the Plan. As such, each falls within the scope of the injunction. In fact, Ms. Solomon has maintained a claim against the Trust for these injuries. She has elected Option 3 under the Plan and has received in the ordinary progression of handling claims an offer from the Trust in an amount exceeding $140,000.

**F.   Carol Eastland**

Ms. Eastland has brought suits in the Superior Court of the State of Washington for King County against University Hospital and other medical providers. She contends in a memorandum filed with the Court that a Dalkon Shield had been inserted in her uterus in 1971, but that she had been under the belief that it had been removed until she was operated on for a hysterectomy and as a further consequence of an analysis of the removed organs, a Shield was found to have been in Ms. Eastland. In a deposition taken in connection with Ms. Eastland's suit in the Superior Court, Ms. Eastland testified to having had a high fever and severe cramps and suffered from infection prior to her hysterectomy.

Ms. Eastland's contention in its simplest form is that the presence of the Shield led to the necessity of a hysterectomy, though she contends her medical providers failed to either remove the Shield or to advise her that she had one. In any event, her injury, by her own contentions, was caused by the presence of the Shield, whether the injury claimed is infertility or the hysterectomy. It follows that her claimed injuries are not premised exclusively on medical malpractice independent of the Shield and her asserted actions are not Unreleased Claims.

**G.   Ralph G. Reiser, *Attorney for Cathleen and Anthony Galeotafiori***

Finally, the Trust seeks a permanent injunction restraining Ralph G. Reiser, Attorney at law for claimants Cathleen and Anthony Galeotafiori, from pursuing an action filed in New York, on behalf of the aforementioned Galeotafiores, husband and wife. Reiser filed the action against medical providers who attended Mrs. Galeotafiore on or about April 6, 1989, subsequent to the entry by this Court of its Confirmation Order embodying the Injunction referred to in Section 8.04 of the Plan and the Releases referred to in Section 8.03.

In the suit pending in the Supreme Court of the State of New York, County of Nassau, Mrs. Galeotafiore alleges in pertinent part that the doctor defendants implanted

an intrauterine device in her and that while in place she became pregnant and "conceived a child on or about January 25, 1973." She alleges that following the birth of her child, the defendants assured her that the IUD previously implanted in her body had been removed during the birth of her child on January 25, 1973, but that it, in fact, remained in her body and had become displaced without her knowledge. She states in that suit: "The aforesaid IUD, which had been reportedly removed by the defendants from the body of plaintiff CATHLEEN GALEOTAFIORE on January 25, 1973, was negligently permitted to remain in her body and did remain therein without her knowledge, *resulting in the development of a cyst on plaintiff's uterus and resulting in perforation of the uterus.*" She alleges further that the physician's negligence permitted the Shield to remain in her body "as a *foreign object, thereby resulting in injury to plaintiff.*" (Emphasis added).

Mr. Reiser contends that the suit is one independent of the Shield and is solely a matter of negligence on the part of the named defendants. The fact is, however, the alleged physical injury—"development of a cyst on plaintiff's uterus and resulting in perforation of the uterus"—was caused by the presence of an IUD. At oral argument, it was admitted that the IUD in question was a Shield. In fact, Mrs. Galeotafiore, the principal plaintiff in the New York suit, has filed and has pending an active claim against the Breland Insurance Trust for injuries arising from her use of the Shield.

This claim covers those injuries for which Ms. Galeotafiore has also sought relief in her actions in New York. Consequently, the duplicative actions fall within the scope of the Plan's injunction and do not constitute Unreleased Claims.

### III. *Conclusions*

The Court finds it illogical to read the Injunctive and Release provisions of the Plan without concluding that it was contemplated that any and all monetary claims for injuries related to the Shield are the exclusive responsibility of the Trust. With the exception of Carol Ann Eastland, the parties to the issue under consideration have all made claims to the Trust for monetary compensation for alleged Shield related injuries. Ms. Eastland, of course, may still make such a claim and has indicated through counsel that the filing of a late claim has been under consideration.

Section 1.85 dealing with Unreleased Claims is to the Court crystal clear in its language that an unreleased claim must be one that is "based exclusively on medical malpractice." The word exclusive is defined in the unabridged edition of The Random House Dictionary as "Not admitting of something else;" "Single or Sole." Exclusively, an adverb simply means singly or solely.

In the Summary of the Plan contained in the Sixth Amended and Restated Disclosure Statement, at page 38 in highlighted language, it is stated:

**CONFIRMATION OF THIS PLAN WILL LIKEWISE BAR YOUR RIGHT TO OBTAIN ANY RECOVERY AGAINST OTHER THIRD PARTIES SUCH AS DOCTORS, CLINICS, HOSPITALS, OTHER HEALTH CARE PROVIDERS, AND DISTRIBUTORS OF THE DALKON SHIELD (EXCEPT FOR RECOVERIES BASED ON INDEPENDENT MALPRACTICE).**

As suggested above, for these parties to contend that their respective lawsuits are based exclusively on medical malpractice is, in the Court's view, spurious. In addition, any suggestion that the Court is without jurisdiction to exercise its injunctive powers has been settled by its Court of Appeals. *See A.H. Robins Co. v. Piccinin,* 788 F.2d 994 (4th Cir.), *cert. denied,* 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986).

Certain of the defendants in the suits at issue have expressed an intention to seek relief from the Trust for any monetary damages they may suffer as a consequence of the pending suits. The Court is not so naive as to believe a similar attitude does not exist amongst other defendants or that suits against the Trust, by other defen-

dants will not be brought seeking damages for contribution, indemnification or under some other theory that may be settled upon in the minds of bright and energetic members of the Bar. The danger of interference with the anticipated success of this bankruptcy proceeding is, under the circumstances suggested, a reasonable expectation. Indeed, the very need to adjudicate the instant matters has taken its toll in expenditure of personnel, time and expense.

It is of some interest that counsel for Linda Hammacher expresses concern that the policy of the Trust in interpreting Section 1.85 (Unreleased Claims) is, to use his phrase, unreasonably broad, and hence casts doubt on whether the Trust has given "adequate consideration to the policy or financial implications of its present position...." While the Court is appreciative of counsel's "offer [of] some constructive recommendations," it is to be remembered that this Court's role, as a supervisory court precludes the making of policy, that function is exclusively the function of the Trustees. The Court has understood that it is contrary to the Trustee's policy to engage in a division of their responsibilities.

Finally, counsel suggests that the terms of the Plan, including the injunction, do not preclude movant, Mr. Hammacher, from maintaining his course of action against the medical providers because he is not a "claimant in these proceedings." Counsel is reminded that Mr. Hammacher's alleged cause of action arises, by virtue of his wife's injuries, related to the Shield and is, therefore, a Shield claim. The Injunction now in effect covers "all Persons who have held, hold or may hold claims, including without limitation, Dalkon Shield Claims...." Mr. Hammacher may, of course, bring a claim against the Trust, though at this late stage the viability of such a claim may be less than if it had been timely made. That is a choice he must make with the advice of counsel.

One or more of the movants suggests that the Trust meet with plaintiffs' attorneys "to seek concurrence on a set of standards" to determine "application of Section 1.85 in the future." As appreciative as the Court may be of counsels' expressed desire to help, two reasons indicate that such a meeting would be futile. One, of course, is borne out by the record, and by the fact that neither the Court nor the Trust may negotiate. The setting of policy is solely in the hands of the Trustees and for them to negotiate any facet of the Plan would be contra to established policy. The claimants have expressed in overwhelming numbers their approval of the Plan, hence, any deviation is impermissible.

The second is even more clear. Section 8.05(c) of the Plan specifically retains to the Court jurisdiction "to resolve controversies, and disputes regarding interpretation and implementation of the Plan." The Court has concluded that the maintenance of the suits in issue is contra to Section 8.03 of the Plan and in contravention of this Court's injunctive order entered in accord with Section 8.04 of the Plan. No negotiations could change the Court's conclusion nor could they affect the viability of similar attempts at collateral litigation in the future.

This action has imposed on the Plan and innocent claimants a financial burden which in fairness should be borne by those responsible.

An appropriate Order will enter.

### ORDER

Upon due consideration of the respective motions to interpret the plan, the motion of the Dalkon Shield Trust for judgment on the pleadings, as well as its motion for injunctive relief against Ralph G. Reiser, and for the reasons stated in the Memorandum of the Court this day filed, it is ADJUDGED AND ORDERED as follows:

The respective motions to interpret the Plan be and the same are hereby GRANTED, as is the Dalkon Shield Trust motion for injunctive relief against Ralph G. Reiser.

IT IS FURTHER ADJUDGED AND ORDERED that the pending actions of Tessie Rogers, Ann Colby Dill and William H.

Barnes, Linda Hammacher, June E. Welsh and Gerald Welsh, Carol Ann Eastland, Laurie Soloman, as well as the suit brought by Ralph G. Reiser on behalf of Kathleen and Anthony Galeotafiore be and they are hereby declared to be subject to the injunction and release provisions set forth in Section 8.03 and 8.04 of the Sixth Amended and Restated Disclosure Statement of the Debtor in this cause.

IT IS FURTHER ADJUDGED AND DECLARED that Section 1.85 of the Plan dealing with "Unreleased Claims" be and the same is interpreted to mean as follows:

"An 'Unreleased Claim' based on medical malpractice referred to in § 1.85(a)(iii) of the Plan is a claim by a holder of a Dalkon Shield Claim or a Dalkon Shield Liquidated Claim for damages for injuries caused solely by actions or omissions by Persons (other than Robins, the Successor Corporation, the Trust, the Other Claimants Trust, or their Affiliates) that allegedly amounted to medical malpractice, where the Dalkon Shield may have been involved or otherwise present in the sequence of events, but played no part in any alleged resulting injury, nor was in any manner a claim based upon or arising from or related to the Dalkon Shield, the research and development, manufacture, distribution, sale, provision, recommendation, insertion, use or removal of a Dalkon Shield, the processing, adjustment, defense, settlement, payment, negotiation or handling of any claims, demands, suits, proceedings or causes of action based upon or relating in any way to the Dalkon Shield, or the failure to warn, disclose or provide information concerning, or to take remedial action with respect to, the Dalkon Shield, including, without limitation, (a) those for death or personal injuries, including emotional distress, (b) those of any Person against whom any claim, demand, pro-

ceeding, suit or cause of action based upon or in any manner arising from or relating to any of the matters enumerated or described above has been, is or may be asserted (including, without limitation, rights of indemnity, whether contractual or otherwise), contribution, subrogation and reimbursement, (c) those for damages, including punitive damages, (d) those for attorneys' fees and other expenses, fees or costs, (e) those for any possible economic loss or loss of consortium, (f) those for damage to reputation, and . . .". *See* Article I, Section 1.37 of the Plan (pp. 293–94 infra).

Claimants:  Tessie Rogers

Colby Dill and William H. Barnes

Linda Hammacher

June E. and Gerald Welsh

Carol Ann Eastland

Kathleen and Anthony Galeotafiore

and each of the attorneys for the aforementioned shall, on the 29th day of October, 1991, at 9:00 a.m., appear and show cause, if any they can, why they should not be monetarily sanctioned for having allegedly violated the injunction of this Court.

Each of the claimant parties and their respective counsel are mandatorily enjoined to take immediate steps to cause their respective suits now pending against their respective alleged health providers to be dismissed. Counsel for each of said parties shall, within fifteen (15) days of this date, advise the Court of the steps taken to accomplish the required dismissal of the respective suits which are the subject of this Order.

Counsel for the Trust is directed to appear on the date aforementioned and present evidence in reference to costs expended by the Trust, including personnel time incurred as a consequence of the alleged violation of this Court's injunction.

## APPENDIX A

The Dalkon Shield Claimants Trust
Claims Resolution Facility
Post Office Box 444
Richmond, Virginia 23203

### GENERAL RELEASE OF CLAIMS

**NOTE:** Sign this Release only if you wish to settle and release your Dalkon Shield claim by electing to be paid under Option 2 or Option 3. This Release must be signed by the claimant named below in the presence of a Notary Public. Do not copy for use by another person. Do not change or alter the language of this Release. Read the accompanying materials carefully before signing this Release. If you have non-legal questions, call your Personal Contact at the Trust between 8:30 a.m. and 8:30 p.m., Eastern Standard Time.

**YOU DO NOT NEED AN ATTORNEY TO SIGN THIS RELEASE. HOWEVER, IF YOU HAVE AN ATTORNEY, YOU SHOULD REVIEW THIS RELEASE WITH HIM OR HER. IF YOU DO NOT FULLY UNDERSTAND THIS RELEASE OR WISH TO SEEK LEGAL ADVICE ABOUT YOUR RIGHTS AND YOU DO NOT HAVE AN ATTORNEY, YOU MAY WISH TO CONSULT ONE BEFORE SIGNING THIS RELEASE.**

Name of Claimant and Settlement Amount:

RECEIVE

AUG 1 3 1990

DALF ON SHIEI
CLAIMANTS TRI

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖
*DS81685*

DS81685
TESSIE F. ROGERS
SETTLEMENT AMOUNT: $74.116.13

## Definitions

I understand that certain words will, whenever they are used in this Release, be considered to have precise meanings as defined below:

a. The **Trust** is the Dalkon Shield Claimants Trust.

b. The **Plan** means A. H. Robins Company, Incorporated's Sixth Amended and Restated Plan of Reorganization (including all exhibits thereto), as modified or amended from time to time.

c. The **Claims Resolution Facility** means the document entitled "Claims Resolution Facility," which has been incorporated into and made a part of the Plan.

d. The **Released Parties** are the people and organizations that I am, under the terms of this Release, agreeing to discharge from certain actual or potential legal duties, claims or liabilities toward me. Specifically, the Released Parties are: the Trust itself, the Dalkon Shield Other Claimants Trust, A. H. Robins Company, Incorporated, the American Home Products Corporation and The Aetna Life and Casualty Company, as well as their respective affiliates, successors or subsidiaries and present or former officers, directors, agents, attorneys, employees, contractors or consultants and any and all other persons entitled to the benefit of the release set forth in Section 8.03 of the Plan or the injunction set forth in Section 8.04 of the Plan.

e. The phrase **fully release** means (a) that I intend my release to be effective not only on behalf of myself but also my heirs, representatives, successors or assigns; and (b) that the release extends to all my associated rights and claims of any kind, whether based in tort, fraud, contract or any other legal theory, and whether I possess them now or may come to possess them.

f. The **Settlement Amount** means the amount of money the Trust has offered me to settle my Dalkon Shield claim under Option 2 or Option 3, which amount appears on the label on this page of this Release and in the offer letter accompanying this Release.

## General Release

1. I have elected to receive payment under either Option 2 or Option 3 of the Claims Resolution Facility. I accept payment of the Settlement Amount as full settlement of my claim.

2. In consideration of the payment of the Settlement Amount, I hereby fully release, waive and discharge all rights or claims of any nature, whether based upon tort, fraud, contract or otherwise, which I now possess or may later possess against the Released Parties, based upon or in any manner arising from or relating to (1) the Dalkon Shield; (2) the research and development, manufacture, distribution, sale, provision, recommendation, insertion, use or removal of a Dalkon Shield; (3) the processing, adjustment, settlement, payment, defense, negotiation or handling of any claims, demands, suits, causes of action or proceedings, based upon or relating in any way to the Dalkon Shield; or (4) the failure to warn, disclose, or provide information concerning, or to take remedial action with respect to, the Dalkon Shield, including, without limitation, (a) those for indemnity, whether contractual or otherwise, contribution, subrogation and reimbursement with respect to any claim, demand, proceeding, suit or cause of action that has been, is, or may be asserted against any person based upon or in any manner arising from or relating to any of the matters enumerated or described in (1), (2), (3) and/or (4) above, (b) those for death and personal injuries, including emotional distress, (c) those for damages, including punitive damages, (d) those for attorneys'