COURT OF APPEALS OF VIRGINIA


Present:   Judges Elder, Humphreys and Kelsey
Argued at Richmond, Virginia


PHILIP SURLES

v.      Record No. 1782-05-2

KRISTAN MAYER                                            OPINION BY
                                                JUDGE ROBERT J. HUMPHREYS
PHILIP SURLES                                            APRIL 25, 2006

v.      Record No. 2064-05-2

KRISTAN MAYER AND
 MARTY CULLEN, JR.


            FROM THE CIRCUIT COURT OF SPOTSYLVANIA COUNTY
                            George Mason, III, Judge

            Kristie L. Kane (Simmons, Brown & Kane, P.L.C., on briefs), for
            appellant.

            Barry J. Waldman (Waldman & Associates, LLC, on briefs), for
            appellee Kristan Mayer.

            No brief or argument for appellee Marty Cullen, Jr.


        Appellant Philip Surles ("Surles") appeals the trial court's denial of his petition for

custody of his biological daughter, Kayla.  In a connected case, Surles also appeals the denial of

his motion for visitation with Kayla's half-sibling, James, whose biological father is appellee

Marty Cullen, Jr. ("Cullen"), and to whom Surles has no biological ties.  We consolidated these

separate appeals for purposes of oral argument, and, because the two cases involve similar

factual and legal issues, we have also consolidated them for purposes of this decision.

        On appeal, Surles argues that the trial court erred in determining that he lacked standing

to pursue visitation with James because he is not a "person with a legitimate interest" within the

meaning of Code § 20-124.1, even though he resided intermittently with James, Kayla, and their biological mother, appellee Kristan Mayer ("Mayer"). Surles further contends that the trial court erred in determining that, even if he is a "person with a legitimate interest," he failed to prove that awarding visitation would be in the best interests of the child. Surles also argues that the trial court erroneously: (1) held that granting him custody of Kayla would not be in the best interests of the child, (2) permitted Mayer to relocate to Florida with the children, and (3) admitted evidence that, while living with Mayer, Surles had been involved in relationships with other women. For the reasons that follow, we affirm the judgments below. We also deny Mayer's request for an award of the attorneys' fees incurred on appeal.[1]

## I. BACKGROUND

On appeal, we view the evidence in the light most favorable to Mayer, the party prevailing below. Yopp v. Hodges, 43 Va. App. 427, 430, 598 S.E.2d 760, 762 (2004). So viewed, the evidence in this case establishes the following.

In November of 1998, Mayer and Surles began dating. At the time, Mayer had a ten-month-old son, James. During the early months of his relationship with Mayer, Surles saw James "maybe twice, three times a month." During the summer of 1999, however, Mayer started to work from her home, and Surles and James began to have contact "almost [] everyday." At that point, James had virtually no contact with Cullen, his biological father. As a result, Surles served as James' primary father figure.[2]

In February of 2000, Mayer and Surles moved in together. They separated soon afterwards, when Mayer discovered that Surles had "cheated on her." In the middle of July,

---

[1] The guardians *ad litem* failed to file an appellate brief, appear during oral argument, or otherwise enter an appearance before this Court.

[2] The record reflects that Cullen began informal visitation with James when the child was approximately two years old. Cullen also pays child support to Mayer.

however, the parties reunited, and, one month later, Mayer discovered that she was pregnant with Surles' child. In May of 2001, Mayer gave birth to Kayla. The parties never married, however, and, in December of 2002, they ended the relationship. Surles has since become engaged to another woman.

While Mayer and Surles were living together, Surles was, on at least two separate occasions, physically abusive toward Mayer. Specifically, Surles once "shoved Ms. Mayer in the bedroom over a laundry basket and onto the bed." On another occasion, Surles, who "had been drinking," "smack[ed]" Mayer while at the home of a family friend.

Following the parties' separation, Mayer filed a petition for custody of Kayla. On May 5, 2003, the Spotsylvania County Juvenile and Domestic Relations District Court entered a "Custody/Visitation Order" granting the parties joint legal custody of Kayla. According to the court order, Mayer obtained primary physical custody of Kayla, and Surles received the right to "reasonable and seasonable visitation" with the child. Following entry of this custody order, James occasionally accompanied his half-sister to Surles' home for visitation. James' last visit with Surles occurred in November of 2003.

In late 2003, Mayer's father moved to Florida. Accordingly, Mayer—who worked as a loan officer for a mortgage company—decided to accept a transfer offer to Florida. In January of 2004, Mayer notified Surles by letter that she intended to relocate to Florida in March of 2004.

After receiving the letter, Surles filed a motion to amend the May 2003 custody order on the grounds that Mayer "is moving to Florida." Surles requested that he "be granted physical custody of Kayla or that [Mayer] be prohibited from moving from Virginia," reasoning that, if Mayer were permitted to relocate, Kayla "will be effectively alienated from her Father." Surles also filed a petition seeking visitation with James, alleging that James "is a child whose visitation requires determination as provided by [Code § 16.1-241(A)(3)]."

After conducting an expedited hearing regarding Surles' petition to amend the May 2003 custody order, the juvenile and domestic relations district court denied Surles' request. By final order dated April 8, 2004, the court also held that Mayer was permitted to move to Florida with Kayla, further providing that Surles was to receive visitation with Kayla "for six consecutive days per month beginning April 2004." Immediately following issuance of the order, Mayer moved to Florida. The rest of Mayer's family—including her mother and stepfather—soon followed.

After Mayer moved to Florida, the juvenile and domestic relations district court scheduled a hearing to resolve the merits of Surles' petition for visitation with James. Cullen—James' biological father—did not appear at the hearing before the district court.[3] By order dated September 10, 2004, the district court denied Surles' request for visitation with James. Surles appealed this decision to the circuit court, and he also appealed the April 2004 order allowing Mayer to relocate to Florida and denying Surles' petition to amend the custody arrangement regarding Kayla.

While the appeals to the circuit court were pending, Mayer and Surles had difficulties scheduling his court-ordered visitation with Kayla. These problems apparently stemmed from

---

[3] However, on March 5, 2004, Cullen mailed a letter to the court indicating that he was on full bed rest recovering from major surgery and would, therefore, be unable to appear at the hearing. Cullen further informed the court that he opposed Surles' motion for visitation, that he was "in full agreement" with Mayer's "decision to relocate to Florida," and that the two had "mutually agreed on visitation [with James] after [Mayer's] expected move in March of 2004." This letter was directed solely to the attention of the "court of Spotsylvania," and it was marked "Received and Filed" in the circuit court on September 21, 2004. Because the parties presumably were unaware of the letter's existence, it was not introduced as an exhibit in the proceedings before the circuit court, and it was not included in the Joint Appendix filed on appeal. Also, the record fails to indicate whether the trial court considered this letter when reaching its decision. Regardless, because, as discussed in Part II(A)(2), infra, the letter is not necessary to the resolution of this appeal, we need not decide whether it would have been appropriate for the trial court to consider its contents when deciding the merits of this case, nor do we decide whether it would be appropriate for this Court to consider the letter on appeal.

the parties' different work schedules—Mayer preferred to have the visitation begin on a weekend, so she would not have to miss work, whereas Surles—a firefighter who works four ten-hour days a week—preferred to have visitation begin on one of his days off, which are often weekdays. However, although Surles was only given six consecutive days of visitation with Kayla under the April 2004 visitation order, Mayer allowed him "seven or more" days of visitation on some occasions.

Also, because Mayer missed several office meetings while trying to convey Kayla to and from Virginia, she lost the job that enabled her to work at home. Instead, in September of 2004, she started a new office job as a loan processor with another mortgage company. As a result, Mayer enrolled Kayla in a "Head Start" program that lasts from approximately 8:00 a.m. until 5:15 p.m. Kayla also started gymnastics lessons in Florida, and James became involved in a Cub Scouts program. Also, after moving to Florida, Kayla stopped having problems with her allergies, which had troubled her since birth. Thus, Kayla's allergy specialist recommended that she stop taking her prescription allergy medication.

During the May 10 hearing before the circuit court, Surles testified that he had been a "father figure" to James and had "treated [James] just like he was my son." Surles also said that he "took [James] under [his] wing" because James' biological father "was only around . . . a handful of times" during "the first couple years." Similarly, Surles' father testified that Surles' relationship with James was "just like any father would have with any son."

As to Kayla, Surles said that, when she comes to visit, "[s]he's a whole lot more clinging to me" than she had been before the move to Florida. Similarly, Surles' father— Kayla's grandfather—testified that, generally, Kayla "seems to be a little bit nervous and very glad to be here." Surles also said that, if he is awarded custody of Kayla, he has made arrangements for her to receive child care while he is at work.

At the conclusion of Surles' case-in-chief, Mayer moved to strike the petition for visitation with James, reasoning that there was no evidence that James would suffer actual harm in the absence of visitation. In response, Surles argued that "actual harm has been shown at this point" because the child has been "emotionally harmed by the fact that he has limited contact with Mr. Surles . . . ." Mayer also made a second motion to strike, arguing that Surles lacked standing to seek visitation with James because he did not fall within the "statutory standard of a party who has a legitimate interest." In response, Surles argued that he fell within the statutory definition of "blood relatives and family members" because he is the father of James' half-sister. The court took both motions to strike under advisement.

Mayer, testifying on her own behalf, stated that her entire family now resides in Florida. Specifically, in addition to her father and stepmother, Mayer's brother, half-brother, stepbrother, uncle and seven-year-old cousin, grandfather, and step-grandparents live in Florida. According to Mayer, the children have become close to each of these members of her family. For example, Mayer stated that, in the year and a half since the family moved to Florida, the children visited with her brother (their uncle) between twelve and fifteen times, each visit lasting for an entire weekend.

Additionally, Mayer testified that Surles was involved with other women on three separate occasions during the course of their two-and-a-half-year relationship. Surles objected on the grounds of relevance, and Mayer responded that the evidence was relevant because "Surles is trying to paint himself as a man who is completely and utterly concerned about his family." The court overruled the objection, noting its belief that "morals are always an issue."

According to Mayer, the first incident involving another woman—to which Surles had already admitted during his prior cross-examination—occurred soon after the parties moved in together. The second incident occurred when Mayer was "approximately three and a half

months pregnant" with Kayla. Mayer testified that the third incident occurred in December of 2002, presumably precipitating the parties' decision to end the relationship.

Following the parties' closing arguments, the trial court granted Mayer's motion to strike Surles' petition for visitation with James, reasoning that Surles "is not a party in interest" under Code § 20-124.1 because he does not "hav[e] a biological connection with [James]." Thus, by final order dated July 25, 2005, the court found that Surles "is not a person with a legitimate interest pursuant to Virginia Code Section 20-124.1, . . . and further finds that pursuant to Section 20-124.3, . . . the best interests of the child are supported by the continued placement of said child with [Mayer] without order of visitation to [Surles]."

As to the petition for custody of Kayla, the circuit court ruled that "it is appropriate to allow the relocation of the child to Florida" because "the benefit to Kayla of the relocation to Florida outweighs the detriment [to] her relationship [with Surles]." Thus, the court concluded that "the best interests of the child would be served by continued residence in Florida and physical custody to [Mayer]." This appeal follows.

## II. ANALYSIS

In this consolidated appeal, Surles argues that the trial court erred in denying his motion for visitation with James, contending: (1) that he is a "person with a legitimate interest" within the meaning of Code § 20-124.1, and (2) that, considering the factors set forth in Code § 20-124.3, awarding visitation would be in the best interests of the child. In regard to Kayla, Surles contends that the trial court erred in denying his motion to amend the May 2003 custody order or, in the alternative, to deny Mayer's request to move to Florida. Surles reasons: (1) that granting him custody of Kayla would be in the best interests of the child; (2) that the harm to his relationship with Kayla caused by Mayer's relocation to Florida outweighs the benefit of the

relocation to the child; and (3) that the trial court erred in considering evidence that Surles had been involved in relationships with other women.

For the reasons that follow, we hold that, although Surles is a "person with a legitimate interest" within the meaning of Code § 20-124.1 and, thus, has standing to pursue visitation with James, he failed to establish that, in the absence of visitation, James would suffer actual harm. Accordingly, we affirm the denial of Surles' petition for visitation with James. We further hold that the trial court did not err in denying Surles' petition to amend the May 2003 custody order and in permitting Mayer to relocate to Florida. Moreover, we hold that the trial court did not abuse its discretion in admitting evidence demonstrating Surles' tendency to engage in simultaneous relationships with multiple women. Finally, we deny Mayer's request for an award of the attorneys' fees she incurred on appeal.

### A. The Petition for Visitation with James

Under Virginia law, an individual who is not the biological parent of a child may, under certain circumstances, petition for visitation with that child. Specifically, according to Code § 20-124.2, a trial court may, "upon a showing by clear and convincing evidence that the best interest of the child would be served thereby[,] award . . . visitation to any [] person with a legitimate interest." Code § 20-124.2(B). The phrase "person with a legitimate interest" is defined, in pertinent part, as follows:

> "*Person with a legitimate interest*" shall be broadly construed and includes, but is not limited to grandparents, stepparents, former stepparents, blood relatives and family members provided any such party has intervened in the suit or is otherwise properly before the court. The term shall be broadly construed to accommodate the best interest of the child.

Code § 20-124.1.

Initially, then, we must consider whether Surles qualifies as a "person with a legitimate interest," within the meaning of Code § 20-124.1. This presents a pure issue of statutory

- 8 -

construction, which we review *de novo* on appeal.  See <u>Sink v. Commonwealth</u>, 28 Va. App. 655, 658, 507 S.E.2d 670, 671 (1998) ("[A]lthough the trial court's findings of historical fact are binding on appeal unless plainly wrong, we review the trial court's statutory interpretations and legal conclusions *de novo*.").

1.  <u>Whether Surles Is a "Person with a Legitimate Interest"</u>

When deciding whether Surles is a "person with a legitimate interest" within the meaning of Code § 20-124.1, we begin, as always, with the plain language of the statute, for "'[w]here the legislature has used words of a plain and definite import the courts cannot put upon them a construction which amounts to holding the legislature did not mean what it has actually expressed.'"  <u>Barr v. Town & Country Properties</u>, 240 Va. 292, 295, 396 S.E.2d 672, 674 (1990) (quoting <u>Watkins v. Hall</u>, 161 Va. 924, 930, 172 S.E. 445, 447 (1934)).  "We must . . . assume that the legislature chose, with care, the words it used when it enacted the . . . statute, and we are bound by those words as we interpret the statute."  <u>Id.</u>

As noted above, Code § 20-124.1 lists several types of individuals who qualify as a "person with a legitimate interest," specifically, "grandparents, stepparents, former stepparents, blood relatives and family members."  Surles does not fall within the plain meaning of any of these terms.[4]  Unquestionably, Surles is not a grandparent, stepparent, or former stepparent, nor

---

[4] Surles maintained before the trial court, and in his opening brief in this Court, that he qualifies as both a "blood relative" and a "family member" within the meaning of the statute. However, during oral argument, Surles conceded that he does not fall within the plain meaning of these terms.

- 9 -

is he a "blood relative"[5] or a "family member"[6] of James.  Regardless, we hold that Surles—who acted as a surrogate father to James for almost four years—is a "person with a legitimate interest" within the meaning of Code § 20-124.1.

As both parties correctly note, when a statute expressly lists the individuals to be encompassed by its terms, the principle of *expressio unius est exclusio alterius* generally bars application of the statute to persons other than those specifically enumerated in the statute.  See Smith Mountain Lake Yacht Club v. Ramaker, 261 Va. 240, 246, 542 S.E.2d 392, 395 (2001); Commonwealth v. Brown, 259 Va. 697, 704-05, 529 S.E.2d 96, 100 (2000).  It is this principle upon which Mayer principally relies in arguing that Surles has no standing to request visitation with James.

However, in enacting Code § 20-124.1, the legislature provided that the phrase "person with a legitimate interest" includes, "*but is not limited to*," the designated individuals.  Code § 20-124.1 (emphasis added).  Moreover, the legislature expressly stated that the phrase "person with a legitimate interest" is to be "broadly construed to accommodate the best interest of the child."  Id.  The list of individuals in the statute, then, is clearly intended to be illustrative, not exhaustive.  Thus, the principle of *expressio unius est exclusio alterius* is, by its very nature, inapplicable.  See Santa Ana v. Garden Grove, 160 Cal. Rptr. 907, 910 (Ct. App. 1979) ("Use of

---

[5] A "blood relative" is one who shares a common ancestor with the child, see Black's Law Dictionary 164 (7th ed. 1999) (defining "blood" as "[t]he relationship by descent from a common ancestor"), and, thus, is directly related to that child by a consanguineous relationship, see Doyle v. Commonwealth, 100 Va. 808, 811, 40 S.E. 925, 926 (1902) (defining "consanguinity" as "relation by blood"); see also Black's, supra, at 299 (defining "consanguinity" as "[t]he relationship of persons of the same blood or origin").  Thus, a "blood relative" would be, for example, a grandparent, aunt, uncle, cousin, sibling, nephew, or niece.

[6] The generally accepted definition of a "family" is "[a] group of persons connected by blood, by affinity, or by law."  Black's, supra, at 620.  Thus, a "family member" is an individual who is related to the child by "blood," see note 5, supra, by "affinity," which is "the relation of one spouse to the other spouse's kindred," Brooks v. Commonwealth, 41 Va. App. 454, 460, 585 S.E.2d 852, 855 (2003), or by "law."

- 10 -

those words [but not limited to] manifests a legislative intent that the statute not be given an '*expressio unius*' construction.").

Turning now to the applicable canons of statutory construction, we note that,

> [u]nder the rule of *ejusdem generis*, when a particular class of persons or things is enumerated in a statute and general words follow, the general words are to be restricted in their meaning to a sense analogous to the less general, particular words. Likewise, according to the maxim *noscitur a sociis* . . . [,] when general and specific words are grouped, the general words are limited by the specific and will be construed to embrace only objects similar in nature to those things identified by the specific words.

Wood by & Through Wood v. Henry County Pub. Schs., 255 Va. 85, 94-95, 495 S.E.2d 255, 260-61 (1998) (internal quotations and citations omitted); see also Kappa Sigma Fraternity, Inc. v. Kappa Sigma Fraternity, 266 Va. 455, 470, 587 S.E.2d 701, 710 (2003). Thus, if a statute provides an illustrative list of persons or things to which its provisions should apply, an unenumerated person or thing must be "similar in nature" to those expressly listed in order to fall within the scope of the statute. Wood, 255 Va. at 95, 495 S.E.2d at 261; see also Helvering v. Morgan's, Inc., 293 U.S. 121, 125 n.1 (1934) ("[T]he verb 'includes' imports a general class, some of whose particular instances are those specified in the definition.").

To qualify as a "person with a legitimate interest," then, a petitioner need not establish that he is a "grandparent[], stepparent[], former stepparent[], blood relative[] [or] family member[]." Rather, the petitioner need only show that he maintains a relationship with the child similar in nature to those expressly listed in Code § 20-124.1. See In re Henderson, 96 B.R. 820, 835 (Bankr. E.D. Tenn. 1989) ("[I]n cases in which the relationship at issue is not one of the relationships enumerated in [the statute], the relevant inquiry is whether the relationship nonetheless falls within the general class . . . contemplated by the statute. One way to undertake this analysis . . . is to consider whether the relationship at issue is similar to or has characteristics

- 11 -

of any of the relationships [expressly listed in the statute].").[7]  And, when determining whether the relationship between the petitioner and the child qualifies the petitioner as a "person with a legitimate interest," we must keep in mind that this phrase is to be broadly construed, so as to accommodate the best interests of the child.  See Code § 20-124.1.  Ultimately, whether a petitioner's relationship with a child is sufficient to qualify that petitioner as a "person with a legitimate interest" is a fact-specific inquiry that must be resolved on a case-by-case basis.

Here, as Surles argues, his relationship with James is the functional equivalent to that of a "former stepparent."  It is uncontroverted that Surles resided in the same household as James for almost three years, while maintaining a relationship with James' mother similar to that of husband and wife.  During that time period, Surles served as James' primary father figure, and he developed a close relationship with the child.  Also during this time period, Surles and James' mother conceived and gave birth to another child—James' half-sibling.  There can be little doubt that, under these circumstances, James and Surles developed a relationship similar to—if not closer than—that ordinarily established between a stepfather and his stepson.

Thus, under the circumstances of this case, we hold that Surles is a "person with a legitimate interest" within the meaning of Code § 20-124.1.  Accordingly, the trial court erred in holding that Surles lacked standing to pursue visitation with James.  However, because Surles failed to present any evidence indicating that the absence of visitation would result in "actual harm" to James, see Part II(A)(2), infra, we also hold that this error is harmless as a matter of law.

---

[7] We note that the determinative relationship is not that between the petitioner and the child's natural parent, but rather, the relationship between the petitioner and the child.

2. <u>Whether the Trial Court Erred in Denying the Petition for Visitation</u>

The "liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court." <u>Troxel v. Granville</u>, 530 U.S. 57, 65 (2000). That is, "[t]he Due Process Clause 'protects the fundamental right of parents to make decisions concerning the care, custody and control of their children.'" <u>Griffin v. Griffin</u>, 41 Va. App. 77, 82, 581 S.E.2d 899, 901 (2003) (quoting <u>Troxel</u>, 530 U.S. at 66). Accordingly, the statutory best-interests analysis established by Code § 20-124.3 "'unconstitutionally infringes on that fundamental parental right' if it authorizes a court to 'disregard and overturn any decision by a fit custodial parent concerning visitation whenever a third party . . . files a visitation petition . . . .'" <u>Id.</u> at 82, 581 S.E.2d at 901-02 (quoting <u>Troxel</u>, 530 U.S. at 67). As a result, "when fit parents object to non-parental visitation, a trial court should apply 'the best interests standard in determining visitation *only after it finds harm if visitation is not ordered.*'" <u>Id.</u> at 83, 581 S.E.2d at 902 (quoting <u>Williams v. Williams</u>, 256 Va. 19, 22, 501 S.E.2d 417, 418 (1998)) (emphasis added); <u>see also</u> <u>Denise v. Tencer</u>, 46 Va. App. 372, 386, 617 S.E.2d 413, 420 (2005).

Here, Surles argues that James would suffer "actual harm" without visitation because, in essence, James has emotionally bonded with Surles, and Surles is a positive influence in the child's life. However, this Court has made clear that "[a] 'vague generalization about the positive influence' of non-parent visitation cannot satisfy the actual-harm requirement." <u>Griffin</u>, 41 Va. App. at 85, 581 S.E.2d at 903 (quoting <u>In re Berbst</u>, 971 P.2d 395, 396 (Okla. 1998)). Thus, "[t]o justify a finding of actual harm under the clear and convincing burden of proof, the evidence must establish more than the obvious observation that the child would benefit from the continuing emotional attachment with the non-parent." <u>Id.</u> As we have explained,

> No doubt losing such a relationship would cause some measure of
> sadness and a sense of loss which, in theory, "could be"

- 13 -

emotionally harmful. But that is not what we meant by "actual harm to the child's health or welfare." If it were, any non-parent who has developed an emotionally enduring relationship with another's child would satisfy the actual-harm requirement. The constitutional rights of parents cannot be so easily undermined.

Id. at 85-86, 581 S.E.2d at 903 (quoting Williams v. Williams, 24 Va. App. 778, 784-85, 485 S.E.2d 651, 654 (1997), aff'd as modified, 256 Va. 19, 501 S.E.2d 417 (1998)) (citation omitted).

Surles, as the party requesting visitation with James, bore the burden of producing clear and convincing evidence that James would suffer "actual harm" to his "health or welfare" in the absence of visitation. See id. at 85, 581 S.E.2d at 903. Because Surles failed to produce any evidence—much less clear and convincing evidence—that would support a finding of "actual harm" to James' "health or welfare," we hold that the trial court did not err in denying the petition for visitation.

Surles argues, however, that the "actual harm" standard established in Williams and its progeny does not apply under the circumstances of this case. Surles reasons that James' biological father "did not appear at the hearing . . . to express his opinion as to whether [Surles] should be entitled to court-ordered visitation." Surles concludes that, because James' biological father "voiced no objection as to the visitation," the "actual harm" standard is inapplicable because he was not, in fact, requesting visitation "over the objection of the child's parents." We disagree.

This Court has held that the actual harm standard does not apply where one parent objects to the third party's request for visitation, but the other parent affirmatively requests that the third party be allowed visitation. See Yopp, 43 Va. App. at 438, 598 S.E.2d at 765; Dotson v. Hylton, 29 Va. App. 635, 639, 513 S.E.2d 901, 903 (1999). Also, where the third party already possesses, through a valid consent order, joint legal custody of the child and sole physical

custody of the child, the "actual harm" standard is likewise inapplicable. <u>Denise</u>, 46 Va. App. at 388, 617 S.E.2d at 421.

We have never held, however, that, if a biological parent fails to voice an objection to visitation, that failure to object amounts to acquiescence in the third-party's petition for visitation. Indeed, in <u>Griffin</u>, we held that the "actual harm" standard was applicable where the biological father, who merely "appeared and testified that he paid child support, but did not intend to foster a relationship with the child," did not actually "request that visitation be awarded to [the third party]." <u>Griffin</u>, 41 Va. App at 80, 83-84, 581 S.E.2d at 900, 902. Similarly, here, James' biological father did not "request that visitation be awarded to [Surles]." <u>Id.</u> Although Cullen did not appear at the hearing and voice a formal objection to visitation, we decline to hold that a biological parent's silence is the functional equivalent of that parent's affirmative consent.

In a similar vein, Surles contends that Mayer did not actually object to his petition for visitation, reasoning that she only testified that she objected to "a specific schedule of visitation." We disagree. Mayer never testified that she agreed to any form of court-ordered visitation. In fact, when asked whether she was "offering a schedule of visitation at all for James," Mayer responded in the negative. Viewing the evidence and all reasonable inferences that may be drawn from that evidence in the light most favorable to Mayer, it is clear that, although Mayer did not wish for a court order "prohibit[ing] [Surles from] hav[ing] contact with James," she did, in fact, oppose any form of court-ordered visitation.

Under the circumstances of this case, then, neither of James' biological parents affirmatively requested that Surles receive visitation with James. <u>Cf.</u> <u>Yopp</u>, 43 Va. App. at 438, 598 S.E.2d at 765; <u>Dotson</u>, 29 Va. App. at 639, 513 S.E.2d at 903. Thus, the "actual harm" standard enunciated in <u>Williams</u> applies to Surles' petition for visitation. <u>See</u> <u>Griffin</u>, 41 Va. App at 80, 83-84, 581 S.E.2d at 900, 902. And, because Surles failed to produce any

- 15 -

evidence from which it could be determined, under the clear and convincing standard of proof, that James would suffer actual harm in the absence of court-ordered visitation, his request for visitation fails as a matter of law. Accordingly, although the trial court erred in holding that Surles lacked standing to pursue visitation with James, that error was harmless.

3. Whether the Court Erred in Permitting Mayer to Relocate to Florida with James

Finally, Surles contends that the trial court erred in permitting Mayer to relocate to Florida with James, reasoning that, as a result of the move, "the minor child was unable to maintain the regular contact that he had with [Surles] prior to the move." Surles, however, never raised this argument before the trial court. Although the argument that Mayer should not have been allowed to relocate to Florida is preserved with respect to Surles' relationship with his own daughter, see Part II(B)(2), infra, Surles never cited his relationship with James as a ground for preventing Mayer from relocating. Accordingly, we hold that Surles is procedurally barred from raising this issue for the first time on appeal. See Rule 5A:18; see also Roberts v. Roberts, 41 Va. App. 513, 525, 586 S.E.2d 290, 296 (2003).

B. Whether the Court Erred in Denying Surles' Petition for Custody of Kayla and Permitting Mayer to Relocate to Flordia

In a separate appeal, Surles contends that the trial court erred in denying his petition requesting modification of the May 2003 custody order, or, in the alternative, an order preventing Mayer from relocating to Florida with his daughter. For the reasons that follow, we hold that the trial court did not err in concluding that the best interests of Kayla would be served by continuing to reside with her mother, nor did the court err in permitting Mayer to relocate to Florida. We also hold that the trial court did not abuse its discretion in permitting Mayer to present evidence that, while the parties were cohabitating, Surles was involved in relationships with other women. Accordingly, we affirm the judgment below.

1.  <u>Whether the Court Erred in Denying the Petition to Amend the Custody Order</u>

When a party requests a modification of a preexisting custody order, the trial court, "in determining whether a change in custody should be made, must apply a two-pronged test." <u>Ohlen v. Shively</u>, 16 Va. App. 419, 423, 430 S.E.2d 559, 561 (1993). First, the trial court must decide "whether there has been a [material] change in circumstances since the most recent custody award." <u>Id.</u> If so, the trial court must next determine "whether a change in custody would be in the best interests of the child." <u>Id.</u>; <u>see also</u> <u>Keel v. Keel</u>, 255 Va. 606, 611, 303 S.E.2d 917, 921 (1983); <u>Denise</u>, 46 Va. App. at 395, 617 S.E.2d at 425. Under the circumstances of this case, the burden of proving each of these elements was upon Surles, the party seeking modification of the May 2003 custody order. <u>See</u> <u>Denise</u>, 46 Va. App. at 397, 617 S.E.2d at 425.

The trial court, when denying Surles' motion to amend the May 2003 custody order, did not make an express finding that Surles carried his burden of proving a material change in circumstances. Rather, the court merely held "[t]hat the best interests of the child would be served by . . . [an award of] physical custody to [Mayer]."[8] Thus, we assume, without deciding, that Mayer's decision to relocate to Florida constituted a material change in circumstances, and consider only whether the best interests of the child would be served by continuing to reside with her mother. <u>See</u> <u>Sullivan v. Jones</u>, 42 Va. App. 794, 595 S.E.2d 36 (2004).

Code § 20-124.3 lists several factors that the trial court must consider when determining whether a change in custody would further the best interests of the child. As noted by the Virginia Supreme Court, however, "there is no simple, mechanical, cut and dried way to

---

[8] Although the trial court did not spell out the reasons underlying its decision, Surles does not argue that the trial court failed to "communicate to the parties the basis for [its] decision," as required by Code § 20-124.3. <u>Cf.</u> <u>Kane v. Szymczak</u>, 41 Va. App. 365, 585 S.E.2d 349 (2003). Accordingly, we do not address this issue on appeal.

- 17 -

determine whether a change in custody will be in the best interests of children." Keel, 225 Va. at 613, 303 S.E.2d at 922. Rather, "the trial court is bound to consider evidence sufficient to allow it to make a rational comparison between the circumstances of the two parents as those circumstances affect the children." Id. Generally, this "requires an analysis to determine which parent is better qualified to provide the highest quality of care to the child and which home will provide the child with the greatest opportunity to fulfill his or her potential." Turner v. Turner, 3 Va. App. 31, 36, 348 S.E.2d 21, 23 (1986). Ultimately, this Court "afford[s] great deference to the trial court's determination of what is in the best interests of the child." Yopp, 43 Va. App. at 439, 598 S.E.2d at 766. Accordingly, unless the court fails to consider the required statutory factors or applies an incorrect legal standard, a trial court's decision as to whether a change in custody would be in the best interests of the child is reversible on appeal only if "plainly wrong or without evidence to support it." Id.; see also Bailes v. Sours, 231 Va. 96, 101, 340 S.E.2d 824, 828 (1986); Petry v. Petry, 41 Va. App. 782, 790, 589 S.E.2d 458, 462 (2003).

Considering the evidence in the light most favorable to Mayer, we hold that the trial court did not err in determining that Kayla's best interests would be served by continuing to reside with her mother. Kayla, along with her older half-brother, James, has been in Mayer's sole custody and care since she was born. If custody of Kayla were transferred to Surles, she would no longer have daily contact with her sibling. There can be little doubt that separating the children would adversely affect the relationship Kayla has with James, who is only three years her senior. And, as noted by the Virginia Supreme Court, "[w]here it is reasonably possible, brothers and sisters of tender years should be reared together, and have the full benefit of natural ties of affection and interest that such association develops." Hepler v. Hepler, 195 Va. 611, 623, 79 S.E.2d 652, 659 (1954); see also Code § 20-124.3(4) (providing that the trial court should give "due consideration" to the child's relationship with, *inter alia*, "siblings"); Hughes v.

Gentry, 18 Va. App. 318, 323, 443 S.E.2d 448, 451-52 (1994) ("[T]he effect of the separation of siblings must be and should be considered by a court during both the initial determination of custody and in subsequent determinations of change of custody.").

Also, under their current work schedules, both parties would be required to provide child care for Kayla. After moving to Florida, Mayer placed Kayla in a "Head Start" program, thereby giving the child a routine day-to-day schedule that also provides her with certain educational benefits. And, although Surles testified that he made arrangements for Kayla to receive child care if he were awarded custody, he did not produce any evidence indicating that the selected child care facility would be similar in nature to a "Head Start" program.

Moreover, Surles has, in the past, engaged in acts of domestic violence, whereas no evidence indicates that Mayer is prone to such acts. See Code § 20-124.3(9) (providing that the trial court should consider "[a]ny history of family abuse"). Also, although Surles is engaged to marry, he did not introduce any evidence as to the identity, background, or character of his fiancée, who would be an important figure in Kayla's daily life if Surles were to receive primary physical custody of the child. Finally, although the parties have struggled to establish an acceptable visitation schedule, Mayer has frequently allowed Surles longer periods of visitation than that to which he is strictly entitled. See Code § 20-124.3(7) (providing that the trial court should consider "[t]he propensity of each parent to actively support the child's contact and relationship with the other parent, including whether a parent has unreasonably denied the other parent access to or visitation with the child").

From these facts, the trial court's determination that a change of custody would not be in Kayla's best interests is not plainly wrong or without evidence to support it. Thus, we hold that the trial court did not err in denying the petition to amend the May 2003 custody order.

2. <u>Whether the Trial Court Erred in Permitting Mayer to Relocate to Florida</u>

"No Virginia statute specifically addresses relocation of a custodial parent." <u>Petry</u>, 41 Va. App. at 789, 589 S.E.2d at 462. However, upon petition by either parent, "[a] court may forbid a custodial parent from removing a child from the state without the court's permission, or it may permit the child to be removed from the state." <u>Scinaldi v. Scinaldi</u>, 2 Va. App. 571, 573, 347 S.E.2d 149, 150 (1986). Before granting a custodial parent permission to remove a child from the state, "the court must find: (1) a material change in circumstances since the prior decree; and, (2) that relocation would be in the children's best interests." <u>Wheeler v. Wheeler</u>, 42 Va. App. 282, 288, 591 S.E.2d 698, 701 (2004); <u>see also</u> <u>Parish v. Spaulding</u>, 257 Va. 357, 362, 513 S.E.2d 391, 393 (1999). The party seeking permission to relocate bears the burden of establishing both of these elements, <u>Sullivan</u>, 42 Va. App. at 806, 595 S.E.2d at 42, and, on appeal, the court's decision granting or denying permission to relocate is not reversible unless "plainly wrong or without evidence to support it," <u>id.</u>

Here, the trial court did not make an express finding as to whether there had been a "material change in circumstances" since entry of the May 2003 custody order. However, this Court has held that "the relocation of [a] custodial parent constitutes a material change of circumstances," thereby vesting the trial court with jurisdiction to modify a prior custody decree. <u>Hughes</u>, 18 Va. App. at 322, 443 S.E.2d at 451; <u>see also</u> <u>Parish v. Spaulding</u>, 26 Va. App. 566, 573, 496 S.E.2d 91, 94 (1998), <u>aff'd</u>, 257 Va. 357, 513 S.E.2d 391 (1999). Because it is undisputed that Mayer moved to Florida prior to the circuit court hearing, the evidence establishes a material change in circumstances.

Turning now to the issue presented on appeal, we must determine whether the trial court erred in holding that Kayla's best interests would be served by permitting Mayer to relocate to

Florida. For the reasons that follow, we hold that the trial court's decision is not plainly wrong or without evidence to support it. Accordingly, we affirm the judgment below.

As noted by the Virginia Supreme Court, in deciding whether relocation should be permitted, "[t]he welfare of the children [is] the controlling consideration," and "all other matters" are "subordinate." Parish, 257 Va. at 362, 513 S.E.2d at 393. For this reason, where the party seeking permission to relocate has already moved out of state, the trial court may consider any resulting positive or negative changes in the child's life, regardless of whether those changes occurred after the relocation. See Sullivan, 42 Va. App. at 809-10, 595 S.E.2d at 43-44; see also Parish, 257 Va. at 363, 513 S.E.2d at 394. As we have explained,

> "[i]f the court could not retroactively approve a move or order a change in custody[,] . . . having before it evidence that the relocation of the children or the modification of custody would be in the best interests of the children, the court would be required to act contrary to the best interests of the children."

Sullivan, 42 Va. App. at 810, 595 S.E.2d at 44 (quoting Parish, 26 Va. App. at 572, 496 S.E.2d at 94). Thus, "'[w]e [have] decline[d] to establish such a rule.'" Id. (quoting Parish, 26 Va. App. at 572, 496 S.E.2d at 94).

Here, when viewed in the light most favorable to Mayer, the evidence establishes that Kayla is happy, adjusted, and well-settled in her new environment. She has become involved in several community activities, including gymnastics and a local "Head Start" program. Cf. Sullivan, 42 Va. App. at 809, 595 S.E.2d at 43 (affirming order permitting relocation where the child, *inter alia*, had become "integrat[ed] into the [new] community"). All of Kayla's maternal relatives—with whom she has developed close relationships—reside in Florida. See Petry, 41 Va. App. at 793-94, 589 S.E.2d at 464 (affirming order permitting relocation where, *inter alia*, the trial court "had ample basis to conclude that the children would benefit from the nurture and support of their extended family in New York"). Also, Kayla's new home "ha[s] a lot more

room" than the house she occupied in Virginia, including a playroom inside the home. More importantly, Kayla's allergies—for which she consistently required medication while living in Virginia—no longer trouble her. Kayla also has been geographically removed from an area in which she witnessed a traumatic event, specifically, a criminal "reach[ing] over Kayla's head and grabb[ing] Mayer's purse." From these facts, the trial court could reasonably have inferred that Kayla's quality of life improved significantly during the year after she moved to Florida with her mother and half-brother.

Unquestionably, Kayla's relocation may result in less frequent visitation with her father and paternal relatives. However, "the added difficulty in maintaining a beneficial relationship between a child and a non-custodial parent should not be the sole basis for restricting a custodial parent's residence except where the benefit of the relationship cannot be substantially maintained if the child is moved away . . . ." Scinaldi, 2 Va. App. at 575, 347 S.E.2d at 151. Here, the trial court found that "the benefit to Kayla of the relocation to Florida, outweighs the detriment [to] her relationship [with] [Surles]." Considering, as discussed above, the positive aspects of the relocation, that factual finding is not plainly wrong or without evidence to support it. See Wheeler, 42 Va. App. at 295, 591 S.E.2d at 705; Goodhand v. Kildoo, 37 Va. App. 591, 602-03, 560 S.E.2d 463, 468 (2002) (affirming decision permitting relocation, noting that "there was no evidence that the benefits of father's relationship with [his daughter] could not be maintained while she lived in Arizona," and "the evidence presented suggested that the relationship might not be affected at all").

For these reasons, we hold that credible evidence supports the trial court's conclusion that Kayla's best interests would be served by permitting Mayer to relocate to Florida. Accordingly, we affirm the judgment below.

3.  Whether the Trial Court Erred in Admitting Evidence of Surles' Other Relationships

Finally, Surles contends that the trial court abused its discretion in admitting evidence that he had been involved in relationships with various other women while cohabitating with Mayer.  We disagree.

Generally, the admissibility of evidence "is within the broad discretion of the trial court, and a[n] [evidentiary] ruling will not be disturbed on appeal in the absence of an abuse of discretion."  Blain v. Commonwealth, 7 Va. App. 10, 16, 371 S.E.2d 838, 842 (1988); see also Gonzales v. Commonwealth, 45 Va. App. 375, 380, 611 S.E.2d 616, 618 (2005) (*en banc*).  When exercising its discretion in the context of a custody dispute, the trial court must "give primary consideration to the best interests of the child."  Code § 20-124.2(B).  Accordingly, the trial court has broad latitude to admit any evidence that is relevant to the past, present, or future welfare of the child.  See Keel, 225 Va. at 613, 303 S.E.2d at 922 (holding that "the trial court should consider the broadest range of evidence" so that it may "make a rational comparison between the circumstances of the two parents as those circumstances affect the children"); see also Armistead v. Armistead, 228 Va. 352, 357, 322 S.E.2d 836, 838 (1984); M.E.D. v. J.P.M., 3 Va. App. 391, 407, 350 S.E.2d 215, 225 (1986).

Here, Surles contends that the trial court abused its discretion because the fact he had "cheated" on Mayer on multiple occasions was not relevant to the issue of whether he should receive custody of his daughter.  Because this evidence is relevant to Kayla's best interests, however, we hold that the trial court did not abuse its discretion in permitting Mayer to testify about Surles' relationships with other women.

Specifically, Surles engaged in at least three affairs with other women while cohabitating with Mayer.  The third of these affairs precipitated the parties' decision to end their relationship,

resulting in Kayla's removal from a two-parent to a one-parent home. Thus, Surles' affairs have, in the past, had a direct and negative impact on Kayla's well-being.

Moreover, Surles' inability to refrain from engaging in affairs with other women has created palpable hostility between Kayla's biological parents, which plainly does not foster the child's best interests. Thus, the fact that Surles "cheated" on Mayer has undermined the parties' present abilities to cooperate, thereby affecting Kayla's present and future ability to interact freely with both parents.

Additionally, Surles' tendency to engage in affairs with other women bears upon the future stability of his home. Surles testified that he has become engaged to marry. Should he demonstrate the same philandering tendencies with his future wife, he would be placing Kayla at risk of once again being exposed to a broken home. The fact that Surles has been unable to maintain a monogamous relationship in the past is therefore relevant to Kayla's future welfare if Surles were to be given primary physical custody of the child.

Finally, as noted by the Virginia Supreme Court, "[t]he moral climate in which the children are to be raised is an important consideration for the court in determining custody, and adultery is a reflection of a [parent's] moral values." Brown v. Brown, 218 Va. 196, 199, 237 S.E.2d 89, 91 (1977). The fact that Surles demonstrated little or no compunction in "cheating" on the mother of his child has some bearing on his moral character. Accordingly, this evidence was relevant to the "moral climate" in which Kayla would be raised if Surles were to receive custody of the child. See id. ("It is within common knowledge and experience that a child learns by example, especially from his parents. Such utter disregard for moral guidance and social standards can have but ill effect upon the young [child]." (internal quotations omitted)); cf. Roe v. Roe, 228 Va. 722, 727, 324 S.E.2d 691, 694 (1985) ("The father's continuous exposure of the

child to his immoral and illicit relationship renders him an unfit and improper custodian as a matter of law.").[9]

For these reasons, we hold that the trial court did not abuse its discretion in determining that evidence of Surles' relationships with other women was both relevant and admissible. See Brown, 218 Va. at 199, 237 S.E.2d at 91 ("An illicit relationship to which minor children are exposed cannot be condoned. Such a relationship must necessarily be given the most careful consideration in a custody proceeding."); see also Rosenberg v. Rosenberg, 210 Va. 44, 47, 168 S.E.2d 251, 253 (1969) (noting that "adultery is highly relevant to the issue[] of . . . custody"). Accordingly, we affirm the judgment below.

### C. Attorney's Fees on Appeal

Finally, Mayer has requested an award of the attorneys' fees she incurred on appeal. However, because this litigation "addressed appropriate and substantial issues," and "neither party generated unnecessary delay or expense in pursuit of its interests," Estate of Hackler v. Hackler, 44 Va. App. 51, 75, 602 S.E.2d 426, 438 (2004), we deny Mayer's request for an award of attorneys' fees.

### III. CONCLUSION

For these reasons, we hold that the trial court erred in concluding that Surles is not a "person with a legitimate interest" within the meaning of Code § 20-124.1. However, because Surles failed to present evidence that James would suffer actual harm in the absence of visitation, we further hold that the court's error was harmless. We also hold that the trial court did not err in denying Surles' request for custody of Kayla or in permitting Mayer to relocate to Florida with

---

[9] Surles also argues that the evidence was inadmissible under Rule 1:1 because his conduct occurred "prior to the last order of the Juvenile and Domestic Relations Court concerning Kayla." However, the fact that the misconduct occurred prior to an earlier custody order does not render it entirely devoid of probative value in a subsequent custody hearing. Accordingly, this argument is without merit.

Kayla. Further, the trial court did not abuse its discretion in permitting Mayer to introduce evidence that Surles, while cohabitating with Mayer, engaged in affairs with other women. Thus, we affirm the judgments below. Finally, we deny Mayer's request for an award of the attorneys' fees incurred on appeal.

Affirmed.