COURT OF APPEALS OF VIRGINIA


Present:   Judges Humphreys, McClanahan and Alston
Argued by teleconference


JANE LOUISE BERGAUST

                                                        OPINION BY
v.       Record No. 0650-10-4              JUDGE ROBERT J. HUMPHREYS
                                                     JANUARY 11, 2011

EDWARD J. FLAHERTY


                FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
                            Jan L. Brodie, Judge

            Christopher A. Wenger (Benjamin G. Chew; D. Zachary Adams;
            Patton Boggs, L.L.P., on briefs), for appellant.

            Scott A. Surovell (Nathan D. Rozsa; Surovell Markle Isaacs &
            Levy, PLC, on brief), for appellee.


        Jane Louise Bergaust ("Bergaust") appeals the Fairfax County Circuit Court's dismissal

of her petition for child support.  Bergaust alleges the circuit court erred in finding it did not have

personal jurisdiction over the appellee, Edward Flaherty ("Flaherty").  For the reasons that

follow, we affirm the circuit court.

                                I. Background

        In June of 1994, Bergaust traveled to Giverny, France, just outside of Paris, to visit her

mother during the opening of the American Museum.  While there, Bergaust met Flaherty, an

American filmmaker then living in Paris, who was hired to film the event.  Flaherty invited

Bergaust to lunch, and she agreed.  Bergaust met Flaherty for a "nice long lunch," during which

they got to know each other.  They cultivated "an unusual connection."

        Flaherty kept in touch with Bergaust after she returned to her home in Virginia.  Flaherty

called Bergaust as soon as she got back to Virginia, and then "he occasionally would call"

thereafter. Over the next 18 months, the relationship continued to develop. Bergaust returned to France on December 1, 1995 to visit Flaherty. During her visit, Bergaust stayed at Flaherty's apartment. She also shared his bed. Bergaust returned to Virginia a few days before Christmas. Shortly thereafter, she discovered she was pregnant.

Because she had not had sexual intercourse with any other person, Bergaust called Flaherty and explained that the baby was his. Although Flaherty was "a little bit shocked," he said he would do whatever Bergaust wanted to do and he promised to support her "in any way that he possibly could." Flaherty called Bergaust at least twice a week during her pregnancy, and from the very first conversation he acknowledged his paternity. Flaherty offered to secure an abortion pill for Bergaust. He also encouraged her to attend a support group for adoptive birth mothers. During all of these conversations, Flaherty never denied having parented the child; rather, he consistently referred to the forthcoming child as "our baby."

Bergaust's daughter, C.B., was born in Arlington, Virginia, on August 1, 1996. Bergaust immediately called Flaherty to tell him the news. Flaherty was "elated." He was "very excited." After that, Flaherty called Bergaust at least twice a week to talk about the baby. During these early conversations, Flaherty expressly referred to C.B. as "our daughter." In March of 1997, when C.B. was about seven months old, Flaherty came to Virginia for a visit. He wanted to see Bergaust and C.B. Flaherty arrived at Bergaust's house in McLean at around noon and stayed until around five. During this visit, Flaherty held C.B. and played with her. Bergaust later testified that Flaherty was "enamored with" C.B. He "couldn't get over her beauty, and he was just absolutely enchanted with her." This visit was memorialized in pictures.

Upon the conclusion of his visit, Flaherty returned to France. He initially continued to call Bergaust "once every two weeks or so," but then the frequency of his phone calls decreased over time. Flaherty last phoned Bergaust on August 1, 1997, C.B.'s first birthday. Bergaust,

who by that time had not heard from Flaherty in several months, expressed her anger and irritation over Flaherty's lack of involvement in C.B.'s life. Flaherty ended the call; he never called again.

In the summer of 2008, C.B., who was then almost twelve years old, was watching a documentary on television in which Flaherty appeared. C.B. recognized Flaherty from the photographs taken of his visit to McLean in 1997. She expressed her excitement at seeing her father to Bergaust. Berguast did some research on the film and was able to ascertain Flaherty's current address in France.

On March 16, 2009, Bergaust filed a Uniform Support Petition in the Fairfax County Juvenile and Domestic Relations District Court (J&DRC), seeking establishment of paternity and child support. Flaherty defended the action on the ground that the J&DRC lacked personal jurisdiction over him. The J&DRC agreed with Flaherty and, on June 2, 2009, granted Flaherty's motion to dismiss.

On June 11, 2009, Bergaust appealed the J&DRC's dismissal of her petition to the circuit court. Flaherty again moved to dismiss the case for lack of personal jurisdiction. After briefing and oral argument, the circuit court denied Flaherty's motion and found that it did have personal jurisdiction over Flaherty. [1] The case, then, proceeded to trial. Because Flaherty refused to cooperate with discovery, he was prohibited from objecting to Bergaust's evidence at trial and from presenting any evidence on his own behalf. Flaherty did not attend the trial.

Upon the conclusion of the evidence, the circuit court re-visited the issue of personal jurisdiction. The court allowed the parties to submit additional briefs and then issued a letter opinion, dated March 3, 2010, in which it found the circuit court did not have personal

---

[1] The Honorable R. Terrence Ney presided over Flaherty's pre-trial motion to dismiss for lack of personal jurisdiction in the circuit court.

jurisdiction over Flaherty. The circuit court held that Flaherty's contacts with Virginia did not satisfy Virginia's long arm statute or otherwise comport with due process. The circuit court further opined that, even if it did have jurisdiction, there "was insufficient evidence presented from which [the court] could award any more than the presumptive minimum child support required under Va. Code Ann. § 20-108.2(B)." The circuit court, thus, dismissed the case by order dated March 3, 2010.

Bergaust noted this appeal.

## II. Analysis

Bergaust's sole assertion on appeal is that the circuit court erred in finding it did not have personal jurisdiction over Flaherty. Bergaust contends, contrary to the circuit court's findings, that Flaherty's contacts with the Commonwealth satisfy Virginia's long arm statute and that the exercise of jurisdiction over Flaherty comports with due process. We review such issues of statutory and constitutional interpretation under a *de novo* standard of review. See Cabaniss v. Cabaniss, 46 Va. App. 595, 620 S.E.2d 559 (2005).

### A. Virginia's "Long Arm" Statute

"It is well settled that a plaintiff is not entitled to 'a judgment *in personam* to extra-territorial effect if it be made to appear that it was rendered without jurisdiction over the person sought to be bound.'" Harrel v. Preston, 15 Va. App. 202, 204, 421 S.E.2d 676, 677 (1992) (quoting May v. Anderson, 345 U.S. 528, 533 (1953)). To obtain the requisite personal jurisdiction over an out-of-state defendant in a claim for child support, the record must clearly indicate "'at a minimum, a connection to Virginia that is recognized by Virginia's long-arm statute.'" Cabaniss, 46 Va. App. at 601, 620 S.E.2d at 561 (quoting Price v. Price, 17 Va. App. 105, 113, 435 S.E.2d 652, 657 (1993)). "The purpose of our 'long arm statute' is to assert jurisdiction, to the extent permissible under the Due Process Clause of the Constitution of the

United States, over nonresidents who engage in some purposeful activity in Virginia." Danville Plywood Corp. v. Plain & Fancy Kitchens, Inc., 218 Va. 533, 534, 238 S.E.2d 800, 802 (1977) (citing Carmichael v. Snyder, 209 Va. 451, 456, 164 S.E.2d 703, 707 (1968)). Such purposeful activity includes any "single act by a nonresident" giving "rise to a cause of action" in our courts. Id. at 534-35, 238 S.E.2d at 802 (citation omitted).

To that end, Code § 8.01-328.1(A)(8), the statutory provision governing long arm control over child support matters, provides in pertinent part,

> A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action arising from the person's:
>
>     \*      \*      \*      \*      \*      \*      \*
>
> Having . . . (iii) shown by personal conduct in this Commonwealth, as alleged by affidavit, that the person conceived or fathered a child in this Commonwealth[.]

In adopting Code § 8.01-328.1, "the legislature evinced a policy of extending the jurisdiction of its courts to the maximum extent permitted" by due process. Caldwell v. Seaboard S. R., Inc., 238 Va. 148, 153, 380 S.E.2d 910, 912 (1989). Thus, "'the statutory inquiry necessarily merges with the constitutional inquiry, and the two inquiries essentially become one.'" Young v. New Haven Advocate, 315 F.3d 256, 261 (4th Cir. 2002) (quoting Stover v. O'Connell Assocs., Inc., 84 F.3d 132, 135-36 (4th Cir. 1996)). Once the long arm statute is satisfied, the question simply becomes "whether the defendant has sufficient 'minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" Id. (alteration in original) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)).

If Flaherty, in fact, "conceived or fathered" a child in this Commonwealth, he is within reach of Virginia's long arm statute. Thus, the resolution of this case turns on the meaning of the phrase "conceived or fathered" in Code § 8.01-328.1(A)(8)(iii). The circuit court adopted the

definition of those two words advanced by Flaherty, and found that the "plain, common and ordinary meaning of the term 'fathered' used in Code § 8.01-328 is to beget or to procreate as the father; whereas the term 'conceived' refers to the act of the mother becoming pregnant." The circuit court concluded that the General Assembly intended a gender specific definition to each term and treated them as synonyms. Essentially, the circuit court construed the definition of the terms "conceived" and "fathered" to mean Bergaust's act of becoming pregnant and Flaherty's act of making her pregnant. The circuit court then found that since Bergaust literally became pregnant in France, Flaherty was beyond the reach of Virginia's long arm statute because he did not, in the words of the statute, "father[] a child in this Commonwealth." Accordingly, the court held that personal jurisdiction "does not lie under [Code § 8.01-328.1(A)(8)(iii)]."

Bergaust asserts the court's gender specific interpretation of the phrase "conceived or fathered" amounts to plain error. Bergaust suggests instead that the word "conceived" means the act of getting pregnant (since conception cannot occur without the participation of both a male and a female) and the word "fathered" means the acknowledgment of paternity. Bergaust concedes the act of conception took place in France. She simply maintains that because Flaherty acknowledged his parentage of C.B. while in Virginia, the circuit court erred in finding it could not exercise personal jurisdiction over him for purposes of Bergaust's child support petition. Flaherty, on the other hand, maintains the circuit court correctly interpreted the statute in gender specific, synonymous terms, and reasons that Virginia's long arm statute extends only to persons who actually conceive a child here in the Commonwealth. We agree with the argument advanced by Flaherty.

"'Statutory interpretation is a question of law which we review *de novo* and we determine the legislative intent from the words used in the statute, applying the plain meaning of the words unless they are ambiguous or would lead to an absurd result.'" Grafmuller v. Commonwealth,

- 6 -

57 Va. App. 58, 61, 698 S.E.2d 276, 278 (2010) (quoting Wright v. Commonwealth, 278 Va. 754, 759, 685 S.E.2d 655, 657 (2009)).  "Furthermore, we must give effect to the legislature's intention as expressed by the language used unless a literal interpretation of the language would result in a manifest absurdity."  Conyers v. Martial Arts World of Richmond, Inc., 273 Va. 96, 104, 639 S.E.2d 174, 178 (2007).  "If a statute is subject to more than one interpretation, we must apply the interpretation that will carry out the legislative intent behind the statute."  Id.

Where, as here, "a statute contains no express definition of a term . . . [we] infer the legislature's intent from the plain meaning of the language used."  Hubbard v. Henrico Ltd. P'shp., 255 Va. 335, 340, 497 S.E.2d 335, 338 (1998).  Our task requires that we give "proper grammatical effect . . . to the arrangement of words in" the statute, Harris v. Commonwealth, 142 Va. 620, 624, 128 S.E. 578, 579 (1925), and we must presume that "the legislature understood the basic rules of grammar" when drafting the statute, Frere v. Commonwealth, 19 Va. App. 460, 464, 452 S.E.2d 682, 685 (1995).  "[E]very part of a statute is presumed to have some effect and no part will be considered meaningless unless absolutely necessary."  Hubbard, 225 Va. at 340, 497 S.E.2d at 338 (citation omitted).  At all times, "[t]he plain, obvious, and rational meaning of a statute is to be preferred over any curious, narrow, or strained construction."  Commonwealth v. Zamani, 256 Va. 391, 395, 507 S.E.2d 608, 609 (1998).  Ultimately, "we endeavor 'to search out and follow the true intent of the legislature, and to adopt that sense of the words which harmonizes best with the context, and promotes in the fullest manner the apparent policy and objects of the legislature.'"  Andrews v. Creacey, 56 Va. App. 606, 617, 696 S.E.2d 218, 223 (2010) (quoting Colbert v. Commonwealth, 47 Va. App. 390, 394, 624 S.E.2d 108, 110 (2006)).

In this case, because the terms "conceived" and "fathered" are not defined statutorily, we must afford the terms their plain and ordinary meaning.  To "conceive" means "to become pregnant with: be with (child or young)," or "to beget."  Webster's Third New International

- 7 -

Dictionary 469 (1993).  The verb "fathered" means "to make oneself the father of: beget."  Id. at 828.  Thus, it is clear that the plain meaning of the words "conceived" and "fathered" refer to the act of procreation.  Indeed, the word "beget" means "to procreate as the father: sire," or "to give birth to: breed."  Id. at 198.  To "procreate" means "to produce (offspring) by generation: beget, propagate, generate, [or] reproduce."  Id. at 1809.

It is true, as Bergaust contends, that one plain and ordinary meaning of the verb "fathered" includes "to make oneself the father or author of by acknowledgment."  Id. at 828.  However, if the General Assembly intended by the Commonwealth's long arm statute to include the mere acknowledgment of parentage by a nonresident, it presumably would have included the word "mothered" along with "conceived or fathered," in order to encompass the non-custodial mother of a child living in this Commonwealth.  We also note that Bergaust's broad interpretation of the statute would, contrary to its plain wording, create a mere residency requirement in the long arm statute.  Had the legislature intended that result, it could have done so quite easily and specifically.  See, e.g., Barnes v. Commonwealth, 33 Va. App. 619, 628, 535 S.E.2d 706, 710 (2000) ("[I]f the legislature had intended to limit Code § 18.2-32 to abduction in violation of Code § 18.2-48, it would have done so."); Reynolds v. Commonwealth, 30 Va. App. 153, 160, 515 S.E.2d 808, 811-12 (1999) ("If the legislature had intended that operators undergo a forty-hour training program for each individual type of breath test equipment, then it would have said so in the statute.").

This is not to say that Bergaust's argument is entirely without merit.  Indeed, in rendering child support decisions, the first inquiry involves identification of the parents.  Courts making such decisions normally know the identity of the mother, because she gave birth to the child; but often we can only ascertain the identity of the father by the fact that he has publicly held himself out as the father.  While the act of conceiving a child elsewhere may ultimately give rise to a

- 8 -

father's presence, and perhaps even his acknowledgment of paternity, in the Commonwealth, we conclude that, given the words it chose, the General Assembly intended the long arm statute to apply only to both parties responsible for actually conceiving a child in Virginia.

Indeed, Code § 8.01-328.1(C) expressly provides "[w]hen jurisdiction over a person is based solely upon this section, only a cause of action arising from acts enumerated in this section may be asserted against him . . . ." Therefore, the statute does not confer jurisdiction over claims that do not arise from a defendant's acts in the state. See Gallop Leasing Corp. v. Nationwide Mutual Ins. Co., 244 Va. 68, 418 S.E.2d 341 (1992); Virginia Beach v. Roanoke River Basin Assoc., 776 F.2d 484 (4th Cir. 1985). Since mother has filed a petition seeking to establish parentage, her cause of action arose from the father's participation in the act creating the pregnancy (which took place in France), rather than his subsequent act of his acknowledgment of paternity in Virginia. While his acknowledgment may be *evidence* of his parentage, it is only his act in siring the child, and not his later acknowledgment of the child, that gave rise to the cause of action in the Commonwealth's courts. Thus, we hold the long arm statute simply does not, by its plain language, reach those who may have conceived a child elsewhere and later acknowledged paternity in the Commonwealth.

Our analysis is not altered by Bergaust's observation that the word "conceived" is treated in case law, at times, in gender-neutral terms. See, e.g., Monroe v. Angelone, 323 F.3d 286, 305 (4th Cir. 2003) ("By February of 1991, Burde and Krystyna were actively trying to conceive a child."); Gallagher v. Duke University, 852 F.2d 773, 775 (4th Cir. 1988) ("Relying on this advice, the Gallaghers conceived a second child."); Modaber v. Kelley, 232 Va. 60, 62, 348 S.E.2d 233, 234 (1986) ("In March 1978, the plaintiff, in her mid-thirties, and her husband conceived a male child."); Surles v. Mayer, 48 Va. App. 146, 166, 628 S.E.2d 563, 572 (2006) ("Surles and James' mother conceived and gave birth to another child."). Case law also treats

the word "conceived," at times, in gender-specific terms. See, e.g., In re A. H. Robins Co., 131

B.R. 292, 302 (E.D. Va. 1991) ("*she* became pregnant and conceived a child"); Scarpa v. Melzig,

237 Va. 509, 511, 379 S.E.2d 307, 308 (1989) ("In late March 1984, the plaintiff conceived and

became pregnant, and a child was born at full term."); O'Rourke v. Vuturo, 49 Va. App. 139,

145, 638 S.E.2d 124, 126 (2006) ("During the marriage, beginning in 1998, Tammy had an

extramarital affair with Brian O'Rourke, the best man at the couple's wedding, and conceived a

child.").  Whereas the word "conceived" as used in case law applies interchangeably to the

actions of the female in getting pregnant, as well as to the actions of a couple in creating a fetus,

we believe the use of the word "conceived" as used in Code § 8.01-328.1(A)(8)(iii) was intended

to apply only to the actions of the female in getting pregnant.

Indeed, the General Assembly appears to prefer the use of the word "fathered," in

describing the male's participation in pregnancy, elsewhere in the Code of Virginia.  For

example, Code § 20-89.1(b) addresses suits to annul marriage, and provides in pertinent part,

> when . . . at the time of the marriage, the wife, without the
> knowledge of the husband, was with child by some person other
> than the husband, or where the husband, without knowledge of the
> wife, had *fathered* a child born to a woman other than the wife
> within ten months after the date of the solemnization of the
> marriage . . . a decree of annulment may be entered upon proof, on
> complaint of the party aggrieved.

(Emphasis added).  Also, Code § 63.2-1250(A), the putative father registry, provides in pertinent

part:

> Except as otherwise provided in subsection C, a man who desires
> to be notified of a proceeding for adoption of, or termination of
> parental rights regarding, a child that he *may have fathered* shall
> register with the Putative Father Registry *before the birth* of the
> child or within 10 days after the birth.

(Emphasis added). The use of the word "fathered" in these code sections relates strictly to the act of conceiving the child. It, thus, appears that the General Assembly consistently uses the word "fathered" in describing the male's participation in the act of conception.

For these reasons, we hold the circuit court did not err in interpreting the terms "conceived" or "fathered" as used in Code § 8.01-328.1(A)(8)(iii) in gender specific terms and in limiting the definitions of those terms to the act of conception.

### B. Due Process

Flaherty alternatively contends on appeal that, even if Virginia's long arm statute is satisfied by the circumstances presented in this case, the record contains insufficient evidence of the minimum contacts required by due process for the exercise of personal jurisdiction over him.

"Personal jurisdiction analysis is a two step process. First, each alleged cause of action must be measured for a fit against each alleged part of the Long Arm Statute, Va. Code § 8.01-328.1. If no fit is found, the inquiry is at an end: there is no personal jurisdiction." Processing Research, Inc. v. Larson, 686 F. Supp. 119, 121 (E.D. Va. 1988). It is only "if any of the Long Arm provisions fit [that] a further inquiry must be made before jurisdiction can be sustained." Id.

In this case, because we hold the circuit court did not have personal jurisdiction over Flaherty under Virginia's long arm statue, we need not consider further whether the exercise of personal jurisdiction over Flaherty exceeds the limits of due process under the United States Constitution. See Verosol B.V. v. Hunter Douglas, Inc., 806 F. Supp. 582, 589 (E.D. Va. 1992) ("*If the long-arm statute applies*, the court must then determine whether asserting personal jurisdiction over Hunter-Douglas thereunder comports with the Due Process Clause of the Fourteenth Amendment." (emphasis added)). We, therefore, decline Flaherty's invitation to address the matter further.

- 11 -

### III. Conclusion

For the foregoing reasons, we hold the circuit court did not err in finding it did not have personal jurisdiction over Flaherty under Virginia's long arm statute, Code § 8.01-328.1(A)(8)(iii). We further hold that because the circuit court did not have personal jurisdiction over Flaherty under the long arm statute, we need not decide whether Flaherty maintained sufficient minimum contacts with Virginia justifying the exercise of jurisdiction over him under the Due Process Clause of the United States Constitution. We, thus, affirm the judgment of the circuit court.

Affirmed.