PRESENT:  All the Justices

KATHERINE LOUISE CARTER,
EXECUTOR OF THE ESTATE OF
WORTH HARRIS CARTER, JR.,
DECEASED

v.  Record No. 230260

OPINION BY
JUSTICE CLEO E. POWELL
MAY 9, 2024

WAKE FOREST UNIVERSITY
BAPTIST MEDICAL CENTER, *et al.*

FROM THE COURT OF APPEALS OF VIRGINIA

Katherine Louise Carter ("Ms. Carter") appeals the decision of the Court of Appeals that

the Circuit Court for the City of Martinsville lacked personal jurisdiction over Wake Forest

University Baptist Medical Center and Wake Forest University Health Sciences (collectively,

"Wake Forest"). Concluding that Wake Forest did not purposefully avail itself of the privilege of

conducting activities in Virginia, we affirm.

## I.  BACKGROUND

In January 2016, Worth Harris Carter, Jr. ("Mr. Carter") noticed a rash on his scrotum

and groin area and sought treatment with a Virginia dermatologist. After six months of

unsuccessful treatment, Mr. Carter's primary care doctor referred him to Wake Forest in

Winston-Salem, North Carolina.

In June 2016, Mr. Carter traveled to North Carolina for an appointment with Dr. Kevin P.

High,[1] an infectious disease specialist employed by Wake Forest. Dr. High diagnosed the groin

rash as "severe perineal candidiasis" and noted the swelling, inflammation, and lesions on Mr.

_____

[1] Between June 2016 and March 2017, Mr. Carter met with Dr. High two times.

Carter's scrotum. A week later, Ms. Carter messaged Dr. High through the MyWakeHealth portal[2] (the "portal") to update him on her father's condition and to ask whether Mr. Carter could use nystatin powder with his current prescription. The same day, Dr. High responded, "I think what you are describing is the expected evolution of this process. . . I would continue as we have suggest[ed]. If you want to try a bit of nystatin that would be ok." Ms. Carter asked Dr. High to send the prescription to her local pharmacy in Virginia, and Dr. High obliged.

In mid-July 2016, Mr. Carter sought a second opinion at Johns Hopkins Hospital in Baltimore, Maryland. The physicians at Johns Hopkins arranged for Mr. Carter to have follow-up care with Dr. Steven Feldman, a dermatologist employed by Wake Forest. In early August, Mr. Carter traveled to North Carolina for an appointment with Dr. Feldman, who conducted an examination of the groin area.[3] During a follow-up appointment in mid-August, Dr. Feldman advised Mr. Carter to apply zinc oxide to the rash and to return in two months. Two weeks later, Ms. Carter texted Dr. Feldman photo updates of the rash. Dr. Feldman responded, "The skin looks much better! I would keep the current treatment." In the following days, Ms. Carter sent additional photos to Dr. Feldman and asked for suggestions because the groin was starting to "hurt and burn again." Dr. Feldman suggested that Mr. Carter continue taking prednisone and cease using olive oil soap to clean the area.

In late August 2016, Mr. Carter traveled to North Carolina for an appointment with Dr. William B. Applegate, a gerontologist employed by Wake Forest.[4] Dr. Applegate conducted an

---

[2] This is an online patient portal used to send secure messages and access medical records.
[3] Between August and December 2016, Mr. Carter met with Dr. Feldman six times.
[4] Between August and October 2016, Mr. Carter met with Dr. Applegate two times.

assessment and referred Mr. Carter to Dr. Lucian G. Vlad, a wound care specialist employed by Wake Forest.

In late September 2016, Mr. Carter traveled to North Carolina for an appointment with Dr. Vlad.[5] Dr. Vlad diagnosed the condition as "ulcer of the groin, limited breakdown of the skin, and candidiasis of the perineum." Dr. Vlad monitored Mr. Carter's progress and treatment over the course of eight in-person appointments between September and December 2016, and considered whether a biopsy was necessary. Ms. Carter initiated several scheduling calls with Dr. Vlad's office between appointments.

In early January 2017, Mr. Carter met with Dr. Vlad for the ninth time. Dr. Vlad noted that Mr. Carter's condition was "significant[ly] worsening" and that he would discuss the case with the other doctors. Within one week, Ms. Carter messaged Dr. Vlad via the portal to inform him that Mr. Carter was recently hospitalized, so she would have to cancel his upcoming appointment. She also stated that the groin rash was improving. Dr. Vlad responded that he conferred with Dr. Feldman and Dr. High, and they decided to perform a biopsy at Mr. Carter's next appointment. Ms. Carter provided additional updates and rescheduled the appointment.

In late January 2017, Mr. Carter met with Dr. Vlad. He conducted a physical examination of the groin area and found the wound was improving. Dr. Vlad decided to postpone the biopsy and continue the current treatment plan and instructed Mr. Carter to follow-up in two weeks.

Approximately three weeks later, Ms. Carter messaged Dr. Vlad via the portal to notify him of Mr. Carter's current hospitalization. According to Ms. Carter, the local doctor wanted her to follow-up with Dr. Vlad and Dr. Feldman and suggested tapering off the prednisone. Ms.

---

[5] Between September 2016 and February 2017, Mr. Carter met with Dr. Vlad eleven times.

Carter also confirmed that she was still applying the zinc oxide and using soap to clean the wound. Dr. Vlad responded that he agreed with the local doctor's recommendations and instructed Ms. Carter to pass information along to the local doctor about Mr. Carter's prednisone schedule and their plan to perform a biopsy. Dr. Vlad instructed Ms. Carter to ask if the local doctor could get a biopsy while Mr. Carter was in the hospital. Ms. Carter responded that the local dermatology team could not see Mr. Carter until March and provided an update on Mr. Carter's groin. Dr. Vlad stated, "I don't want him to see another dermatologist" and advised her to schedule an appointment with his office within two weeks for the biopsy.

In late February 2017, Dr. Vlad performed the biopsy in North Carolina. A few days later, Ms. Carter messaged Dr. Vlad via the portal to ask if he could call to explain the pathology results. Dr. Vlad called and informed the Carters that the results indicated skin cancer. In early March,[6] Mr. Carter met with Dr. High and several oncologists in North Carolina to undergo further testing and determine a treatment plan. Mr. Carter passed away in April 2017.

In March 2019, Ms. Carter, as executor of Mr. Carter's estate, initiated a lawsuit in the Circuit Court of the City of Martinsville against Wake Forest, four North Carolina doctors, and a Virginia dermatologist.[7] By special appearance, Wake Forest moved to dismiss for lack of personal jurisdiction. In response, the circuit court authorized jurisdictional discovery. Upon the conclusion of jurisdictional discovery, Wake Forest filed an amended motion to dismiss. The circuit court granted the amended motion to dismiss because the application of Virginia's long

---

[6] On March 7, 2017, the State Corporation Commission authorized Wake Forest to transact business in Virginia.

[7] The four North Carolina doctors were non-suited in May 2020. The Virginia dermatologist is not a party to this appeal.

4

arm statute was inconsistent with the due process clause of the Fourteenth Amendment. The

circuit court noted the following undisputed findings of fact:

> 1. WFUBMC is a corporation organized and existing under the laws of North Carolina with its principal place of business in Winston-Salem, North Carolina.
>
> 2. WFUHS is a corporation organized and existing under the laws of North Carolina with its principal place of business in Winston-Salem, North Carolina.
>
> 3. Dr. High, Dr. Feldman, Dr. Applegate, and Dr. Vlad ("North Carolina physicians") were at all pertinent times employees of WFUHS, and they saw the decedent at their offices in Winston-Salem, North Carolina.
>
> 4. The decedent, who first sought medical care from WFUBMC in 1999, did not rely on any advertising or solicitation from the defendants or the North Carolina physicians. Dr. Lewis referred the decedent to Dr. High, and the physicians at Johns Hopkins referred him to Dr. Feldman.
>
> 5. None of the North Carolina physicians was licensed to practice medicine in the Commonwealth of Virginia during the relevant time period.
>
> 6. The telephone calls from Dr. Feldman and Dr. Vlad to the plaintiff while she and the decedent were in Virginia were in response to inquiries from the plaintiff.
>
> 7. The text messages that Dr. Feldman sent to the plaintiff were in response to text messages that the plaintiff had sent to him.
>
> 8. The messages that Dr. High and Dr. Vlad sent to the plaintiff on MyWakeHealth "were in response to messages initiated by her, without her stating where she was located." Amended Motion to Dismiss for Lack of Personal Jurisdiction by Special Appearance, p.10.
>
> 9. The North Carolina physicians wrote various prescriptions and sent them electronically to the decedent's pharmacy in Rocky Mount, Virginia, at the decedent's request.
>
> 10. The North Carolina physicians sent copies of their office notes to Dr. Lewis at the decedent's request.

11. On March 7, 2017, the State Corporation Commission issued to WFUBMC a certificate of authority to transact business in the Commonwealth of Virginia.

12. On June 15, 2020, the plaintiff filed a complaint in Superior Court of Forsythe County, North Carolina, naming as defendants Baptist, WFUHS, WFUBMC, Dr. High, Dr. Feldman, Dr. Applegate, and Dr. Vlad. The lawsuit seeks compensatory damages for the wrongful death of the decedent.

The circuit court concluded that the emails, text messages, and telephone calls from the Wake Forest doctors constituted "transacting business" under Code § 8.01-328.1(A)(1). However, the circuit court concluded the communications did "not constitute purposeful availment of the privilege of conducting activities within the Commonwealth of Virginia."

Ms. Carter appealed. The Court of Appeals affirmed the circuit court and concluded that Wake Forest did not purposefully avail itself of the privilege of conducting business in Virginia. *Carter v. Wake Forest Univ. Baptist Med. Ctr.*, 76 Va. App. 756, 769-70 (2023). The Court of Appeals held that "follow-up care does not confer personal jurisdiction upon a non-resident physician or hospital." *Id.* at 769. In its analysis, the Court of Appeals emphasized that (1) the actual treatment occurred in North Carolina; (2) the Carters initiated contact with Wake Forest via text messages, phone calls, and the portal to follow-up on out-of-state treatment; and (3) Wake Forest did not maintain a presence or solicit business in Virginia. *Id.*

Ms. Carter subsequently appealed to this Court.

## II. ANALYSIS

Ms. Carter argues that Wake Forest purposefully availed itself of the privilege of conducting activities in Virginia by deliberately reaching into the Commonwealth to provide virtual medical care. She contends that the Wake Forest doctors knew that Mr. Carter resided in Virginia, and they purposefully communicated new medical advice, opinions, and treatment through systematic text messages, phone calls, and emails. Wake Forest, on the other hand,

6

argues that it did not purposefully avail itself of Virginia by merely responding to Ms. Carter's messages and requests. Wake Forest contends that such communications are part of routine follow-up care, which doctors are ethically required to provide.

Whether Virginia courts enjoy personal jurisdiction over a non-resident defendant is a question of statutory and constitutional interpretation, which this Court reviews de novo. *Bergaust v. Flaherty*, 57 Va. App. 423, 429 (2011). The circuit court's factual findings "will not be disturbed on appeal unless they are plainly wrong or without evidence to support them." *Collins v. First Union Nat'l Bank*, 272 Va. 744, 749 (2006).

Virginia's long-arm statute provides that a court may exercise personal jurisdiction over a person who transacts business in the Commonwealth or "caus[es] injury in this Commonwealth by an act or omission outside this Commonwealth if he regularly does or solicits business, or engages in any course of conduct, or derives substantial revenue from. . . services rendered, in this Commonwealth." Code § 8.01-328.1(A)(1), (4). We have construed Code § 8.01-328.1 as "a single-act statute, requiring only one transaction in Virginia to confer jurisdiction on our courts." *Peninsula Cruise, Inc. v. New River Yacht Sales, Inc.*, 257 Va. 315, 319 (1999) (collecting cases). "[T]he purpose of Virginia's long arm statute is to assert jurisdiction over nonresidents who engage in some purposeful activity in this State to the extent possible under the due process clause." *Id.* (internal quotation marks omitted). Thus, once the long-arm statute is satisfied, we turn to the constitutional inquiry. *Bergaust*, 57 Va. App. at 430.

The Due Process Clause of the Fourteenth Amendment requires that a non-resident defendant "have certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. State of Washington*, 326 U.S. 310, 316 (1945). The primary focus of the

constitutional inquiry is "the defendant's contacts with the forum state, not the defendant's contacts with persons who reside there." *Walden v. Fiore*, 571 U.S. 277, 285 (2014); *see also Bristol-Myers Squibb Co. v. Superior Ct. of Cal., San Francisco Cnty.*, 582 U.S. 255, 262 (2017).

Specific jurisdiction[8] requires "that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958) (citing *International Shoe Co.*, 326 U.S. at 319). The defendant's acts or contacts with the forum cannot be "random, isolated, or fortuitous," or based on the unilateral activity of another party. *Walden*, 571 U.S. at 284-86; *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984); *Hanson*, 357 U.S. at 253. The contacts must indicate that the defendant "deliberately reached out beyond its home" and into the forum state. *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. ___, ___, 141 S. Ct. 1017, 1025 (2021). Moreover, the plaintiff's claims "must arise out of or relate to the defendant's contacts" with the forum state. *Id.* (citing *Bristol-Myers Squibb*, 582 U.S. at 262). "In other words, there must be an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Bristol-Myers Squibb*, 582 U.S. at 262 (internal quotation marks omitted); *see also Ford Motor Co.*, 141 S. Ct. at 1026 (noting that precedent does not require "a strict causal relationship between the defendant's in-state activity and the litigation").

---

[8] Both sides agree this case involves specific jurisdiction. By contrast, a state court may exercise its general jurisdiction when the defendant is "at home" in the forum state. *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. ___, ___, 141 S. Ct. 1017, 1024 (2021). "[A]n individual is subject to general jurisdiction in her place of domicile," and a corporation is subject to general jurisdiction in its place of incorporation and principal place of business. *Id.*

While the minimum contacts test is intended to be flexible, it nevertheless can be an elusive and fact-intensive inquiry. *See Hanson*, 357 U.S. at 251, 253. *Compare Danville Plywood Corp. v. Plain & Fancy Kitchens, Inc.*, 218 Va. 533 (1977) (concluding that there was no personal jurisdiction over a foreign corporation in contract dispute where a salesperson of a Virginia corporation traveled out-of-state to solicit the business of the foreign corporation, the foreign corporation did not sell products in Virginia, and the underlying contract was formed out-of-state), *with Peninsula Cruise*, 257 Va. 315 (concluding that a foreign corporation purposefully availed itself of Virginia where the foreign corporation's employees delivered a boat within Virginia's boundaries, communicated via telephone from Florida with the plaintiff located in Virginia about repairs, and performed repairs in Virginia). Factors relevant to this analysis include, but are not limited to, whether a nonresident defendant (1) solicits business in Virginia, (2) has a physical presence in Virginia, and (3) communicates with Virginia residents.[9] *Walden*, 571 U.S. at 285; *Hanson*, 357 U.S. at 251; *Peninsula Cruise*, 257 Va. at 321; *Danville Plywood*, 218 Va. at 535.

In *Hanson v. Denckla*, the Supreme Court of the United States concluded that Florida courts lacked jurisdiction over a Delaware trust company based solely on the trust settlor's domicile in Florida. 357 U.S. at 251-54. The Court explained, "the unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State." *Id.* at 253. The Court determined that the Delaware trust company

---

[9] These factors are not exhaustive, but are merely examples. Even if only one of the enumerated factors is present, lower courts must look to the nature and extent of the defendant's contacts with the forum state. *Ford Motor Co.*, 141 S. Ct. at 1024.

lacked sufficient minimum contacts because it did not have an office in Florida, did not transact or solicit business in Florida, and did not hold or administer trust assets in Florida. *Id.* at 251.[10]

*Walden v. Fiore* is also instructive. Two Nevada residents filed suit in federal court in Nevada against a Georgia police officer who worked as a deputized Drug Enforcement Administration ("DEA") agent at a Georgia airport. 571 U.S. at 280-81. The respondents alleged the DEA agent violated their Fourth Amendment rights by seizing their cash in a Georgia airport without probable cause, keeping their cash in Georgia, as well as drafting and forwarding a probable cause affidavit containing false statements to the United States Attorney's Office in Georgia. *Id.* The Supreme Court of the United States concluded that Nevada could not exercise personal jurisdiction over the DEA agent because he lacked minimum contacts with the forum. *Id.* at 288. The Supreme Court clarified that "a defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties. But a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction." *Id.* at 286. Moreover, the location of where a plaintiff feels the effects of the defendant's alleged conduct is not the proper focus of the jurisdictional inquiry. *Id.* at 290. None of the DEA agent's alleged course of conduct occurred in Nevada. *Id.* at 288. Rather, his sole connection to the forum was that the respondents lived there. *Id.*

Applying the foregoing principles, we conclude that Wake Forest did not purposefully avail itself of the privilege of conducting activities in Virginia. It is undisputed that Wake Forest's contacts with Virginia were in response to telephonic or electronic communications

---

[10] Interestingly, we note that, similar to the facts in our case, there was communication across state lines between the Florida settlor and the Delaware trustee, including the remittance of trust funds from Delaware to Florida, but the Court did not list this among the facts it considered. 357 U.S. at 252.

initiated by Ms. Carter while she was in Virginia. Mr. Carter did not rely on solicitations or advertisements by Wake Forest in deciding to seek treatment in North Carolina. All of Mr. Carter's appointments with the Wake Forest doctors occurred in North Carolina. In other words, the Carters were the sole link between Wake Forest and Virginia. This is an insufficient basis to establish personal jurisdiction over the non-resident defendants. *See Walden*, 571 U.S. at 285; *Hanson*, 357 U.S. at 253.

Ms. Carter contends that Wake Forest deliberately encouraged Mr. Carter to communicate with the doctors through the portal and telephone, and that the doctors intentionally responded to his communications. However, we must look to the nature and extent of the defendants' contacts with the forum. *Ford Motor Co.*, 141 S. Ct. at 1024. As noted above, it is undisputed that all of Wake Forest's contacts with Virginia were in response to text messages, emails, and telephone calls initiated by Ms. Carter while she was in Virginia. Responding to questions and updates from a patient or their family is incidental to in-person treatment. Such services are directed to the patient in need, rather than the forum state itself. *Cf. Hume v. Durwood Medical Clinic, Inc.*, 318 S.E.2d 119, 123 (S.C. 1984) ("By providing services to [a patient], the [doctors] were merely fulfilling their professional responsibilities to provide medical services to a patient in need, and should not by doing so automatically subject themselves to the jurisdiction of the courts of this State."). Thus, a mere reaction or response to a message or telephone call, without more, is not purposeful availment. As the Supreme Court stated in *Walden*, while "a defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff[,]. . . a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction." 571 U.S. at 286. Here, the communications between Ms. Carter and Wake Forest are more aptly characterized as isolated or

attenuated, and are insufficient to give rise to jurisdiction. *See Keeton*, 465 U.S. at 774; *International Shoe Co.*, 326 U.S. at 317.

Both sides cite competing cases from federal and state courts involving the exercise of personal jurisdiction over a non-resident physician or hospital who renders follow-up care in the patient's home state. *Compare Wright v. Yackley*, 459 F.2d 287 (9th Cir. 1972) (no minimum contacts); *Prince v. Urban*, 49 Cal. App. 4th 1056 (1996) (no minimum contacts); *Vance v. Molina*, 28 P.3d 570 (Okla. 2001) (no minimum contacts), *with Kennedy v. Freeman*, 919 F.2d 126 (10th Cir. 1990) (minimum contacts and constitutionally reasonable); *Walsh v. Chez*, 418 F. Supp. 2d 781 (W.D. Pa. 2006) (minimum contacts and constitutionally reasonable); *McGee v. Reikhof*, 442 F. Supp. 1276 (D. Mont. 1978) (minimum contacts and constitutionally reasonable). The Court of Appeals adopted a follow-up care rule, *Carter*, 76 Va. App. at 769, which Ms. Carter argues is inflexible and inconsistent with the legislature's policy to extend jurisdiction to the maximum extent possible. On the other hand, Wake Forest notes that the majority of other courts who have considered this issue have concluded that follow-up care rendered via telephone, messaging apps, and email, ancillary to in-person treatment, does not subject a defendant to personal jurisdiction in the forum in which these communications are received. As the circuit court acknowledged, the exercise of specific jurisdiction over non-resident physicians and hospitals "could have a negative impact on interstate physician-patient relationships." This is of particular concern for medically underserved areas in the Commonwealth, including rural communities in Southwest Virginia. In this case, however, we do not view our reasoning as adopting or rejecting a special due process "rule" governing medical providers. We instead apply traditional due process principles to the unique fact pattern in this case and conclude that these principles forbid the assertion by Virginia courts of personal jurisdiction over Wake Forest.

## III.  CONCLUSION

For the reasons stated herein, the judgment of the Court of Appeals is affirmed.

*Affirmed.*